1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ERNESTO ARELLANO,

11                Petitioner,                No. CIV S-10-2684 DAD P

12        vs.

13   KELLY HARRINGTON, Warden,

14                Respondent.              <u>ORDER</u>

15   _____/

16            Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas

17   corpus pursuant to 28 U.S.C. § 2254.  The parties have consented to proceed before a United

18   States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  Petitioner challenges a judgment of

19   conviction entered against him on July 28, 2006, in the Yolo County Superior Court on two

20   counts of first degree murder and two counts of attempted murder.  Petitioner raises nineteen

21   separate claims for federal habeas relief.  Upon careful consideration of the record and the

22   applicable law, the court will deny petitioner's application for a writ of habeas corpus.

23                    PROCEDURAL AND FACTUAL BACKGROUND

24            In its unpublished memorandum and opinion affirming petitioner's judgment of

25   conviction on appeal, the California Court of Appeal for the Third Appellate District provided

26   /////

the following factual summary:[1]

> Defendants James Joseph Olague, Ernesto Duran Arellano, and Oscar Hurtado Cervantes appeal following their conviction for first-degree murder (Pen. Code, § 187; undesignated statutory references are to the Penal Code) of Robert Stepper and Eric Folsom, and attempted murder of Vicki Folsom and Jessica Valdez on Halloween 2002.  Defendants raise a variety of contentions.  We shall order modification of Cervantes's sentence to reduce to a one-third subordinate term a 10-year section 186.22 enhancement on Count 3.  We shall otherwise affirm the judgments.[2]

> FACTUAL AND PROCEDURAL BACKGROUND

> On September 21, 2003, an indictment was filed alleging that defendants and others – Christina Marie Marten, Nathaniel Easlon, Richard Betancourt, and (later added) Gilberto Lopez [3] – committed the following crimes:

> Count 1:  First-degree murder of Robert Stepper (§ 187, subd. (a)), with enhancements alleging the murder was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(4)), Cervantes used a firearm which caused death or bodily injury (§ 12022.53, subds.(a), (d)), and a principal personally discharged a firearm causing death or bodily injury (§ 12022.53, subd. (a)).   Count 2:  First-degree murder of Eric Folsom, with enhancements as above.  Count 3:  Attempted murder of Vicki Folsom (§§ 187, subd. (a); 664, subd. (a)), with enhancements as above.  Count 4:  Attempted murder of Jessica Valdez, with enhancements as above.

---

[1]  Although respondent lodged with this court the opinion of the California Court of Appeal affirming petitioner's convictions, the pages of the lodged document are out of order and some are even missing.  See Notice of Lodging Documents on Aug. 1, 2011 (Doc. No. 18), Resp't's Lod. Doc. entitled "Unpublished Opinion, Third Appellate District; April 7, 2009."  Accordingly, the court will cite to the unpublished opinion at it appears in Westlaw when referring to the opinion of the California Court of Appeal.

[2]  We deny Olague's request for judicial notice (filed July 29, 2008) of a June 2006 newspaper article indicating Jeff Reisig, who was one of the prosecutors in this trial, won election as Yolo County District Attorney.  The request for judicial notice comes too late (the day Olague filed his reply brief, after the People already filed their respondents' brief), with no legitimate justification for the delay.  Even if we were to grant judicial notice, it would not change our disposition of this appeal.

[3]  Marten, Easlon, Betancourt, and Lopez (who was charged in an information) are not parties to this appeal.  Marten was convicted in a separate trial, and the others negotiated dispositions and testified as prosecution witnesses in this trial.  Marten's appeal was pending when these defendants were tried, and we affirmed her judgment in an unpublished opinion (C050078) in December 2007.

2

The indictment also alleged special circumstances for multiple murder and intentional killings as participants in a criminal street gang (§ 190.2, subds. (a)(3), (a)(22).  The prosecutor sought the death penalty against Arellano and Cervantes only, not against Olague.

At trial, the prosecution presented evidence supporting its theory that, although the Norteño and Sureño gangs were rivals, their members cooperated in committing these crimes because Arellano (a Norteño leader or "shot caller") and nonparty Candelario Garza (a Sureño leader) cooperated in the sale of drugs in Woodland. Arellano (a Norteño) ordered the hit because victim Stepper (a Norteño) owed him money for drugs, and Arellano wanted to send a message to others who owed money and re-instill fear in the community.  Christina Marten (a Norteño) brought Stepper to the place of attack.  The shooter was Cervantes, who was not a gang member but who associated with Norteños, Sureños, and Crips. Stepper was the target, and the other victims were shot either because they were in the "kill zone" or because Cervantes intentionally shot them in an attempt to eliminate witnesses. Easlon (a Crips gang member [4]) acted as lookout.  Arellano's neighbor, Gilberto Lopez (a Sureño), was the getaway driver. Olague (a Sureño) was on the street at the time of the shooting to ensure that all participants did what they were supposed to do.

Evidence adduced at trial included the following:

Easlon and Betancourt (Norteño) testified about a gathering at Arellano's apartment before Halloween 2002.  Arellano asked Easlon and Betancourt to "fuck up" (beat up) Robert Stepper, who owed Arellano about $500 to $800 and was not doing what he was supposed to be doing to help the drug trade.  Easlon (who owed Arellano $1,600 for drugs) and Betancourt refused to do the actual deed, because Stepper was their friend.  Arellano asked Cervantes, who was also there, to "handle it."  Cervantes agreed and was given some drugs.[5]  Easlon, to pay off his debt, agreed to Arellano's request to station himself at the end of the street on Halloween and "make sure nobody we know goes down that street . . . ."  Lopez came to the door and was told by Arellano, "[i]t's going to go down," and Lopez was needed as the getaway driver. (Though Lopez had a "beef" with Cervantes, who impregnated Lopez's girlfriend, there was evidence that Lopez did not know Cervantes would be involved.)  Arellano took a phone call, then said "Jaime" and Garza were on the way over with the gun and told

---

[4]  There were so few Crips in Woodland that they had "kind of a peace treaty with the Norteños."

[5]  Richard Betancourt testified "handle it" in gang lingo could mean anything from a beating to a killing.

3

Easlon and Betancourt to leave.[6]  Easlon testified he knows three "Jaimes," one of which is Olague.  Easlon did not stay and therefore did not know if it was Olague who showed up.  However, Easlon testified it was Olague who showed up when the crime took place.

On Halloween, around 10:00 p.m., as planned, Easlon concealed himself at the end of Oak Avenue to stand watch.  Marten walked Stepper down Oak Avenue and then left.  Stepper began chatting with the other victims near a pickup truck in victim Valdez's driveway.  Olague, whose job was to make sure others did their job, walked Cervantes partway down the street.

As related by the surviving victims, a man approached the victims, "kind of" grinned, pulled out a gun, aimed the gun at Stepper's head, and fired from a distance of two feet (killing Stepper).   The shooter then pointed the gun at the others and fired multiple times (killing 17-year-old Eric Folsom and injuring 14-year-olds Vicki Folsom and Jessica Valdez).  At trial, one of the survivors identified Cervantes as the shooter, though she had not identified him a photo lineup.

As Lopez drove the getaway car, Cervantes hit the dashboard and said, "I got 'em, I got 'em."  Lopez had not expected any shooting.  He later told Garza that Veronica Lugo (girlfriend of Guillermo Ramirez, who had been with Lopez) was in an alley and heard the gunshots.  Lugo testified she was summoned to an apartment the next day where several people, including Cervantes and Olague, were present.  Garza, Lopez, and Ramirez led her into a bedroom and told her to keep her mouth shut or she and her children would be killed.

An expert in criminal gangs, Sergeant Steven Gill, said rival gangs do work together in drug activity and will commit a crime such as murder together to further their criminal enterprise, enhance both gangs' reputations, and further instill fear and intimidation in the community and other gang members.  A non-gang member's participation would be a way to be accepted by the gangs.

All three defendants testified at trial and denied any involvement.  Arellano (age 34 at trial) said he was a Norteño for 10 years but was not a shot caller.  He denied any pre-Halloween meeting, denied ordering or suggesting that anyone kill Stepper, and said he did not even know Cervantes or Olague before Halloween 2002, except for an incident where he almost got into a fight with Olague (whom he pegged as a Sureño).  Arellano admitted that on one occasion he told Cervantes to "handle it" but testified he was

---

[6]  Arellano says the evidence was "a gun," not "the gun," with no indication it was part of the plan.  However, the testimony was "the gun."

telling Cervantes to go get a pipe to smoke drugs.   Stepper was Arellano's friend, did not buy drugs from him, and did not owe him money.  On Halloween, Arellano was on his way home, saw Stepper, said hello, and noticed a car full of people wearing blue (a Sureño color).  Arellano said his only prior crimes were spousal abuse, selling drugs, and participating in a prison riot in which he was just following gang orders, though he was in front of his cohorts.

Cervantes (age 28 at trial) testified he has never belonged to a gang, though he knew gang members.  He knew Olague before Halloween, but not Arellano.  When arrested, Cervantes said he "knew this day was coming," but he thought he was being arrested for violating probation.  Cervantes denied telling his cellmate, Richard Bowie, about the case and denied tampering with his handcuffs (evidence of which was adduced as an escape attempt).  Cervantes had a prior felony conviction for selling drugs and a drug-related misdemeanor.  Alibi witnesses testified Cervantes was with them that night.

Olague (age 29 at trial) testified he was a gang member when he lived in Los Angeles (he equivocated on whether it was Sureño) and associated with "southerners" when he moved to Woodland.  He was friendly with Cervantes.  Olague did not know or have any contact with Arellano, except Olague ran from a brief confrontation with Arellano as a member of a rival gang in a parking lot about a month before the crimes.  Olague denied any involvement in the crimes.   He came upon the crime scene after a friend dropped him off and he was walking to a friend's house.  Olague admitted two prior felony convictions, for auto theft and verbally threatening his ex-wife.

To advance the defense theory that the police pressured the accomplices to make false confessions consistent with the prosecution's theory, the defense hammered at inconsistencies in the accomplices' statements, and a defense expert testified about how police interrogations can elicit false confessions.

In May 2006, the jury returned verdicts finding all three defendants guilty on all counts and finding true all enhancement allegations.

In June 2006, the jury set the sentence for Arellano and Cervantes at life without the possibility of parole on the two counts of first degree murder.

The trial court denied defense motions for new trial.

On July 28, 2006, the trial court sentenced Arellano to prison for life without possibility of parole on Counts 1 and 2 (first degree murder).  The court sentenced Arellano to nine years on Count 4 (attempted murder) and a consecutive term of two years, four

1    months on Count 3 (attempted murder).  The court imposed three
     25-years-to-life terms for the section 12022.53, subdivisions (d)
2    and (e), enhancements on Counts 1 through 3 and a 20-year term
     for the section 12022.53, subdivision (c), enhancement on Count 4.
3
     Cervantes received the same sentence, plus two 10-year section
4    186.22 enhancements on Counts 3 and 4 plus an eight-month
     consecutive term on an unrelated drug offense.
5
     Olague received the same sentence as Arellano, except Olague
6    received the midterm sentence of seven years (rather than the upper
     term of nine years) for the Count 4 attempted murder.
7

8    People v. Olague, et al., No. C053372, 2009 WL 924503, **1-3 (Cal. App.3 Dist., Apr. 07,

9    2009) (hereinafter Opinion)

10             On May 12, 2009, petitioner filed a petition for review in the California Supreme

11   Court.  ("Petition for Review," lodged on Aug. 1, 2011.)  The Supreme Court summarily denied

12   that petition by order dated July 15, 2009.  ("Order Denying Petition for Review," lodged on

13   Aug. 1, 2011.)

14             Petitioner filed his federal petition for a writ of habeas corpus on October 4, 2010.

15   Respondent filed an answer on July 6, 2011, and petitioner filed a traverse on February 21, 2012.

16                                         ANALYSIS

17   I.  Standards of Review Applicable to Habeas Corpus Claims

18             An application for a writ of habeas corpus by a person in custody under a

19   judgment of a state court can be granted only for violations of the Constitution or laws of the

20   United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the

21   interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S.___, ___, 131 S. Ct.

22   13, 16 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146,

23   1149 (9th Cir. 2000).

24             Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal

25   habeas corpus relief:

26   /////

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the state court decision. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). Nonetheless, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[7] Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that

---

[7] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

1   application must also be unreasonable." Williams, 529 U.S. at 412. See also Schriro v.

2   Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal

3   habeas court, in its independent review of the legal question, is left with a 'firm conviction' that

4   the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit

5   precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of

6   the state court's decision." Harrington v. Richter, 562 U.S.___,___,131 S. Ct. 770, 786 (2011)

7   (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for

8   obtaining habeas corpus from a federal court, a state prisoner must show that the state court's

9   ruling on the claim being presented in federal court was so lacking in justification that there was

10  an error well understood and comprehended in existing law beyond any possibility for fairminded

11  disagreement." Harrington,131 S. Ct. at 786-87.

12          If the state court's decision does not meet the criteria set forth in § 2254(d), a

13  reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v.

14  Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th

15  Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because

16  of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

17  considering de novo the constitutional issues raised.").

18          The court looks to the last reasoned state court decision as the basis for the state

19  court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.

20  2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning

21  from a previous state court decision, this court may consider both decisions to ascertain the

22  reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en

23  banc). "When a federal claim has been presented to a state court and the state court has denied

24  relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

25  of any indication or state-law procedural principles to the contrary." Harrington, 131 S. Ct. at

26  784-85. This presumption may be overcome by a showing "there is reason to think some other

8

1  explanation for the state court's decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker,

2  501 U.S. 797, 803 (1991)).  Where the state court reaches a decision on the merits but provides

3  no reasoning to support its conclusion, a federal habeas court independently reviews the record to

4  determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860;

5  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is

6  not de novo review of the constitutional issue, but rather, the only method by which we can

7  determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at

8  853.  Where no reasoned decision is available, the habeas petitioner still has the burden of

9  "showing there was no reasonable basis for the state court to deny relief." Harrington, 131 S. Ct.

10  at 784.

11          When it is clear, however, that a state court has not reached the merits of a

12  petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a

13  federal habeas court must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v.

14  Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir.

15  2003).[8]

16  II.  Petitioner's Claims

17          A.  Insufficient Evidence

18          Petitioner's first claim for federal habeas relief is that the evidence introduced at

19  his trial was insufficient to support "several of the convictions and gang findings."  (Doc. No. 1

20  (hereinafter Pet.) at 9.)[9]  Specifically, petitioner argues that:  (1) there was insufficient evidence

21  introduced to support his convictions on counts two, three, and four (the murder of Eric Folsom

22  and the attempted murder of Vicki Folsom and Jessica Valdez) under the natural and probable

23  _____

24      [8]  The United States Supreme Court has recently granted certiorari in a case apparently to
    consider this issue.  See Williams v. Cavazos, 646 F.3d 626, 639-41 (9th Cir. 2011), cert. granted

25  in part, ___U.S.___, 132 S. Ct. 1088 (2012).

26      [9]  Page number citations such as these are to the page number reflected on the court's
    CM/ECF system and not to page numbers assigned by the parties.

1    consequences doctrine; (2) there was  insufficient evidence to support the jury finding that he

2    committed premeditated and intentional gang murder of Eric Folsom; and (3) there was

3    insufficient evidence to support the jury finding that his offenses were committed to aid a

4    criminal street gang.  (Id. at 57-63.)  Petitioner argues that his convictions for the murder of

5    Folsom and the attempted murders of Vicki Folsom and Jessica Valdez "take the natural and

6    probable consequences doctrine to an extreme" and were improperly based on negligence alone.

7    (Id. at 58-59.)

8            With regard to his conviction for the first degree murder of Eric Folsom,

9    petitioner argues that there was no evidence introduced at his trial that he intended to kill anyone

10   other than Stepper.  (Id. at 59.)  He notes that the trial judge opined during the jury instruction

11   conference that the trial evidence did not "suggest that there was a plan to kill or attempt to kill

12   anyone other than Stepper" and that a jury verdict of the first degree murder of Eric Folsom

13   would "probably be error."  (Id.; Reporter's Transcript on Appeal (RT) at 14160.)  Petitioner

14   argues that the prosecution theory that petitioner intended to "eliminate" any witnesses who were

15   present when Stepper was shot was based on "mere speculation" and that "such conjecture and

16   surmise cannot suffice for the essential elements of first-degree murder."  (Pet. at 59.)  He also

17   argues that there was no substantial evidence he knew that any witnesses would be present at the

18   scene of the shooting, that he ordered the "elimination" of witnesses, or that the indiscriminate

19   shooting of "friendly associates" was the natural and probable consequence of the intended

20   shooting of Stepper.  (Id. at 59-60.)

21           Petitioner further claims that, absent evidence he specifically intended to kill Eric

22   Folsom, there was insufficient evidence "to fulfill intentional gang murder circumstances."  (Id.

23   at 60.)  In this regard, he explains:

24           The jury's finding of the intentional gang killing special
             circumstances as to Folsom is even less explicable.  For that
25           finding requires that the killer and nonkiller accomplice alike
             specifically intended Folsom's death; natural and probable
26           consequences are not enough.  (citation omitted.)  The fact these

jurors made this finding – despite the prosecutor's concession there
was no evidence petitioner intended to kill anyone (assuming
arguendo) but Stepper – bespeaks volumes to the prejudicial effect
of the other errors discussed in this brief, not the actual evidence
surrounding these killings.

(Id. at 62.)  Petitioner notes that the prosecutor did not charge him with the premeditated

attempted murder of the female victims and argues, "how could there be any premeditated intent

to eliminate Folsom as a witness, but not the females?"  (Id.)

With regard to the special circumstance that the offenses were committed to aid a

street gang, petitioner argues that because the participants were all from different gangs, there is

insufficient evidence that the killings were committed on behalf of "a norteno street gang subset,

as opposed to a prison gang or a regional affiliation."  (Id.)  He claims that "herein we have a

case involving a diverse group allegedly assisting an attack to aid a personal or joint drug

dealing, not dealing for any particular gang and with the specific intent to promote, further, or

assist in any criminal conduct by gang members."  (Id..)  Petitioner explains that "the seriously

overbroad rubric of 'Norteno' used here is not even a cognizable street gang."  (Id. at 63.)

The California Court of Appeal rejected all of these arguments raised by petitioner

on appeal, reasoning as follows:

**VII. Substantial Evidence**

Arellano argues no substantial evidence supports (1) the
convictions regarding the three victims other than Stepper under
the natural and probable consequences doctrine; (2) findings of
premeditated and intentional gang murder of Eric Folsom; and (3)
a finding the shootings were gang-related.  Cervantes joins and
adds there was no evidence he was a gang member.  Olague joins
and adds a claim that, because there was insufficient evidence of
his involvement, the trial court erred in denying his motion for
acquittal (§ 1118.1) at the close of the prosecution's case in chief.

We review substantial evidence claims under the familiar standard
of review of the whole record to determine whether any rational
trier of fact could have found the elements of the crime beyond a
reasonable doubt.  (People v. Kraft (2000) 23 Cal.4th 978,
1053-1054.)  The same standard governs our review of the
acquittal motion.  (People v. Valerio (1970) 13 Cal. App.3d 912,
919.)  For purposes of this appeal, we will accept Olague's

11

argument against adoption of a federal rule about waiver of acquittal where a defendant presents evidence.  We shall conclude substantial evidence supports the judgments.

**A. Natural and Probable Consequences**

Murder convictions may be sustained on the theory that murder was a natural and probable consequence of a planned assault with a deadly weapon.  (People v. Prettyman (1996) 14 Cal.4th 248, 262-263.)  Arellano argues this was, at most, a targeted walk-up shooting to discipline one person in the gang, Stepper, and the shooter's unexplained, indiscriminate shooting of nonresisting associates was "beyond the pale" and should not be attributed to accomplices.  However, there was evidence this was not simply to discipline one person.  There was evidence that Arellano was angry that so many of his fellow gang members owed him money for drugs and were consuming the drugs instead of selling them.  He wanted to send a message and instill fear in the community.  When Lopez asked why they needed him to be a getaway driver if all they were going to do was "smash on him [Stepper]," Arellano said it was going to be a little bit more than that.  Arellano told Easlon and Betancourt to leave the pre-Halloween gathering because Olague was bringing the gun over for Cervantes to check out.

Substantial evidence supports murder and attempted murder as a natural and probable consequence.

**B. Premeditation/Intent**

Arellano argues he could not be convicted of first degree murder of Eric Folsom under a natural and probable consequences theory, unless premeditation was a natural and probable consequence of the alleged plan.  Arellano says the prosecutor did not even allege premeditation with respect to the shooting of Eric Folsom.  However, Arellano cites no authority supporting his position.   The indictment did allege first degree premeditated murder of Eric Folsom, and the prosecutor argued to the jury that defendants murdered Folsom because he was in the wrong place at the wrong time, and defendants knew they could not afford to leave any witnesses behind.

Arellano says the court commented it believed the jury would err if it found anything more than second degree murder as to Folsom (as the other jury found in Christina Marten's trial).  However, that comment, made during discussion of jury instructions, was made before the prosecutor explained the theory he planned to argue to the jury (which the court conceded was arguable), that when Cervantes approached the truck and saw Stepper was not alone but was talking and laughing with other people, Cervantes had time to decide whether to proceed or abort the plan; he had time to calculate, deliberate, and decide to kill all of them; he proceeded to

shoot Stepper and then proceeded to aim at and shoot the others; and his coconspirators were bound by his acts.  The prosecution presented this theory to the jurors in closing arguments, as well as the argument that gang members are schooled "the more violent you are, the better . . . ."

Substantial evidence supports the prosecutor's theory.  There was evidence about violence as a component of gang culture, as well as the plan in this case to do something major to instill fear in the community.  Cervantes had time to see Stepper was not alone before proceeding with the plan, yet Cervantes chose to proceed.  After shooting Stepper, Cervantes aimed at and fired gunshots at the other three, and there was evidence of this from the surviving victims.

Arellano cites (without discussion) <u>People v. Francisco</u> (1994) 22 Cal. App.4th 1180 at pages 1188-1191.  However, Francisco rejected a defendant's claim that the aiding/abetting instruction misled the jury into believing that an intent to kill was not necessary for first degree murder.  (<u>Id.</u> at p. 1189.)  Francisco said it "is well settled that a defendant whose liability is predicated on his status as an aider and abettor is not required to have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator.  It is the intent to encourage and bring about the criminal conduct of the planned offense which the jury must find, not the specific intent that is an element of the target offense." (<u>Ibid.</u>)

Arellano also cites (without discussion) <u>People v. Caesar</u> (2007) 153 Cal. App.4th 114, which was depublished after Arellano filed his opening brief and later replaced by <u>People v. Caesar</u> (2008) 167 Cal. App.4th 1050.  <u>Caesar</u> is distinguishable, because the problem there was that the jury found the nonshooter guilty of premeditated attempted murder despite finding the shooter guilty of unpremeditated attempted murder.

Arellano argues the finding of intentional gang killing as a special circumstance (§ 190.2, subds.(a)(22) & (c) [10]) as to Folsom makes even less sense, because that finding requires that the actual killer

---

[10]  Section 190.2 states in part: "(a) The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole [LWOP] if one or more of the following special circumstances has been found [true] . . . [¶]  (22) The defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang . . . and the murder was carried out to further the activities of the criminal street gang.  [¶] . . . [¶] (c) Every person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for [LWOP] if one or more of the special circumstances in subdivision (a) has been found to be true . . . ."

and the accomplice both specifically intend Folsom's death; natural and probable consequence is not enough.  Arellano says the fact the jury made this finding despite the prosecutor's concession of no evidence Arellano intended to kill anyone but Stepper, speaks to the prejudicial effect of other errors assigned on appeal.  He cites the jury instruction that this special circumstance required findings that "1.  A defendant intentionally killed the victim or, with the intent to kill, aided and abetted in the killing;  [¶] 2.  At the time of the killing, that defendant was an active participant in a criminal street gang;  [¶] 3.  The members of that gang engaged in . . . a pattern of criminal gang activity;  [¶] 4.  That defendant knew that the gang members engaged in or have engaged in a pattern of criminal gang activity; and  [¶] 5.  The murder was carried out to further the activities of the criminal street gang."

However, there was evidence, and the prosecutor did argue, that the murder of any witnesses was part of the plan.  The plan was to make a big statement to instill fear in the community.  They planned the event for Halloween, when people are out at night.  Cervantes saw witnesses were with Stepper, yet continued with the plan and approached and shot Stepper.  Cervantes then pointed and shot at Eric Folsom at close range.  The act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice.  (People v. Smith (2005) 37 Cal.4th 733, 741-742 .)   Cervantes was not a shot caller or even a gang member, which supports the inference he was following the plan.

We conclude substantial evidence supports the conviction for first degree murder of Eric Folsom as to all three defendants.

**C. Section 186.22**

Arellano argues there is no substantial evidence of gang-related offenses under section 186.22, because there is no substantial evidence the offenses were committed on behalf of a Norteño street gang subset, as opposed to a prison gang or a general regional affiliation.  However, as Arellano acknowledges, we have held to the contrary, that a subset need not be identified.  (People v. Ortega (2006) 145 Cal. App.4th 1344.)

Arellano also argues this case involves a diverse group assisting an attack to aid a personal or joint drug dealing, not dealing for any particular gang.  However, the evidence here meets the standard for section 186.22, that the crime was committed for the benefit of, at the direction of, or in association with any criminal street gang, and with specific intent to promote, further, or assist in any criminal conduct by gang members.  (People v. Gardeley (1996) 14 Cal.4th 605, 616-617.)

/////

> Cervantes argues there was no evidence he was a gang member. However, a person need not be a gang member to be guilty of violating section 186.22.  (In re Jose P. (2003) 106 Cal. App.4th 458, 466.)  Here, there was plenty of evidence that Cervantes associated with gang members, understood gang culture, was present when Arellano and Olague discussed the plan, and that a non-gang-member would be trusted as shooter in a gang-related crime with an eye toward earning membership in the gang. Cervantes complains the expert gave as an (invalid) example of association the fact that Cervantes once lived with Olague's family. However, that example did not stand alone.
>
> The evidence sufficed for application of section 186.22

(Opinion at *38-40.)

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318).

In conducting habeas review of a claim of insufficient evidence, "all evidence must be considered in the light most favorable to the prosecution." Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011).  "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  In order to grant the writ, the federal habeas court must find that the decision of the state court reflected an objectively unreasonable application of Jackson and Winship to the facts of the case. Ngo, 651 F.3d at 1115; Juan H., 408 F.3d at 1275 & n.13.  When a federal habeas court assesses a

1   sufficiency of the evidence challenge to a state court conviction under AEDPA, "there is a double

2   dose of deference that can rarely be surmounted."  Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir.

3   2011).

4          Viewing the evidence in the light most favorable to the verdict in this case, and

5   for the reasons expressed by the state appellate court, this court finds that there was sufficient

6   evidence introduced at petitioner's trial to support his convictions on the charges relating to the

7   three victims other than Stepper under the natural and probable consequences doctrine.  The

8   court also finds that there was sufficient evidence introduced at trial to support the jury's findings

9   of the premeditated and intentional gang murder of Eric Folsom and that the shootings were

10  gang-related.

11         As explained by the state appellate court, there was evidence introduced at

12  petitioner's trial that petitioner and his associates intended to kill fellow gang member Stepper

13  and possibly do "a little bit more than that" in order to send a message to the community that

14  failing to pay for drugs and consuming drugs when those drugs should have been sold would not

15  be tolerated.  There was also evidence that violence was part of gang culture and that the murder

16  of witnesses who were present at the scene of a killing may have been part of petitioner's plan to

17  instill fear in the community.  The decision of the state appellate court with respect to these

18  claims is not contrary or an unreasonable application of clearly established federal law and is not

19  "so lacking in justification that there was an error well understood and comprehended in existing

20  law beyond any possibility for fairminded disagreement."  Harrington,131 S. Ct. at 786-87.

21  Accordingly, petitioner is not entitled to federal habeas relief with respect to his claims

22  challenging the sufficiency of the evidence.

23         B.  Exclusion of Evidence of Third Party Culpability/ Denial of Motion for New Trial

24         In his next ground for relief, petitioner argues that the state trial court violated his

25  right to due process when it excluded evidence of third party culpability and denied his related

26  motion for a new trial.  (Pet. at 9.)  Specifically, petitioner argues that the trial court erroneously

excluded statements from Rudy Gonzalez and Mark Estrada, both of whom asserted their Fifth
Amendment privilege not to testify at petitioner's trial, and also improperly excluded "further
supporting testimony from Mr. Michel." (Id. at 63.) Petitioner contends that the exclusion of
this evidence left him "with an unfairly incompletely [sic] patchwork of third party culpability
evidence when, in fact, there was more considerable indications pointing towards an
indiscriminate Sureno on Norteno shooting." (Id.)

The California Court of Appeal explained the background to this claim, as
follows:

### I. Exclusion of Evidence Re Third Party Culpability

Defendants argue the trial court improperly excluded some
evidence of third party culpability and erred in denying their
motion for new trial on this ground, in violation of their
constitutional rights to present a defense. We disagree.

### 1. Background

The trial court conducted an Evidence Code section 402 hearing.
The defense called as a witness Rudy Gonzalez, who refused to
answer questions. Arellano's investigator, James Peoples, testified
regarding an interview he conducted with Rudy Gonzalez in
February 2006 (more than three years after Halloween 2002), in
which Gonzalez supposedly made statements against his penal
interest. According to Peoples, Gonzalez said he knew Cervantes
did not commit the crime and wanted to help because Cervantes
has a child. Gonzalez said he and other Sureños decided on
Halloween night "to get a buster" (a Norteño). They had no one in
mind; it was random. They had guns, including a .22 caliber.
Gonzalez said he stayed home, while the others drove around in
two cars, looking for Norteños. It thus appears, Gonzalez was
relating hearsay when he told Peoples the Sureños drove around,
came upon the victims, drove around the block, let out one of the
Sureños to do the shooting, drove to a park and waited, then
returned to Gonzalez's home. Peoples said Gonzalez said he heard
on a police scanner the report of gunshots fired. Peoples said that
Gonzalez said that Bowie said he was going to use Cervantes to get
out of his own (Bowie's) case.

Marcelino Michel, a (former) Norteño who shared a jail cell with
David Cordero, testified that Cordero stated in jail that he was
drinking at the home of Rudy Gonzalez that Halloween night.
Gilberto Lopez, Guillermo Ramirez, and Rudy Gonzalez, Sr., left
to "smoke" a Norteño and later returned, acting "weird," after a

police scanner in the home reported gunshots fired.

David Cordero took the stand at the hearing and denied making the statements to Michel.  Cordero said he was at Rudy Gonzalez's home that night.  There was a scanner there.  Cordero drank beer and got beat up.[11]

The trial court ruled Gonzalez's statement was inadmissible because it was not against his penal interest, was not proper third party culpability evidence, was unreliable, and was more prejudicial than probative.  (Although Arellano says the trial court erroneously accepted the prosecution's view that admission of Gonzalez's hearsay statement would deny the prosecution's right to cross-examine in a "reverse Crawford violation," it appears the trial court ultimately did not rule on that basis.)

At a later hearing under Evidence Code section 402, Mark Estrada refused to answer questions.  Carlos Munoz testified he and his friend Estrada were Sureños.  According to Munoz, Estrada on the day after the Halloween shootings said that he and his family, which included Rudy Gonzalez, "had something to do with it," "[t]hat they just disposed of the gun" by throwing it off a bridge.  When asked if he remembered telling defense investigators that Estrada said his cousin and family did the shooting, Munoz said yes, "I remember him telling me that."

The trial court did not allow Peoples to testify and limited Munoz's testimony, noting Estrada's statement about involvement was limited to disposing of the gun and, even if it might subject Estrada to liability as an accessory after the fact or coconspirator, such involvement would not absolve any of these defendants (as required for third party culpability evidence)

In front of the jury, Cordero testified he was at Gonzalez's home on Halloween and got beat up, but he denied telling Michel anything about a shooting.

Michel testified to the jury that, in jail, Cordero said he was at Rudy's house that night; Rudy Sr. left with Gilberto Lopez and Guillermo Ramirez and returned acting strange; while they were gone, a police scanner in the house reported gunshots were fired.  Also, Veronica Lugo told Michel that Guillermo Ramirez bragged about being involved in the Halloween murders.

The trial court instructed the jury, "The defendants in this case have introduced testimony for the purpose of showing that another

---

[11]   According to Cervantes's appellate brief, Cordero invoked the Fifth Amendment but said this is what he would say if he were to testify.  We see no invocation, but it would not make any difference.

person or persons may have committed or been involved in a separate or different conspiracy, to commit the crimes for which these defendants are here on trial.  If, after consideration of all the evidence, you have a reasonable doubt that any or all of these defendants committed any of the crimes charged, you must find that defendant or those defendants not guilty."

The defense moved for a new trial based in part on the exclusion of third party culpability evidence.  The trial court denied the motions.

(Opinion at *35-37.)

Petitioner argues that the trial court's ruling excluding evidence of third party culpability constituted an arbitrary and unreasonable application of state hearsay rules and deprived him of due process, compulsory process, and the right to present a complete defense. (Pet. at 64-69.)  He contends that the excluded proposed testimony constituted "a strongly significant statement of an independent Sureno involvement in a gang-on-gang attack beyond Lopez, Olague, Garza, or Memo; it clearly points directly to a broader indiscriminate Sureno attack."  (Id. at 67.)  Petitioner asserts that he "should never have been limited to sketchy evidence of an independent Sureno attack that night when much more was available."  (Id. at 68.) He contends that the proposed testimony of third party culpability "impeached the entire shaky prosecution theory, including Valdez's suspect identification of Cervantes as the shooter."  (Id.) Petitioner also argues that issues regarding the credibility of these witnesses were for the jury, and not the judge, to decide.  (Id.)

In affirming petitioner's judgment of conviction the California Court of Appeal rejected these arguments, reasoning as follows:

**2. Analysis**

Evidence of third-party culpability must be admitted when it tends to show that someone other than the defendant committed the offense (subject to Evidence Code section 352).  (People v. Hall (1986) 41 Cal.3d 826, 829.)  To withstand exclusion under Evidence Code section 352, the evidence need only be capable of raising a reasonable doubt of the defendant's guilt.  (People v. Cudjo (1993) 6 Cal.4th 585, 609.)

19

Since this case involved an uncharged conspiracy between multiple parties, evidence that others may have been culpable would not tend to show that these defendants were not culpable.   Moreover, the court did allow some of defendants' evidence.

Defendants argue the trial court erred in excluding the statements of Rudy Gonzalez and Mark Estrada and supporting testimony from Marcelino Michel (that Cordero said an unknown person said they were going to "smoke" Norteños).  Defendants think the excluded evidence contradicted the prosecution's timing of events and showed the crime was a spontaneous moment of gang rivalry rather than a planned conspiracy.

However, as to Rudy Gonzalez, even assuming for the sake of argument that his statement to Peoples was against Gonzalez's penal interest, it was unreliable hearsay because Gonzalez was not even there.  He stayed home.  He refused to name the persons who apparently told him they went out and shot someone.  Without showing who made those statements, it could not be shown that those persons were unavailable, and therefore those statements were not admissible as declarations against those persons' interest. Defendants' citation to People v. Provencio (1989) 210 Cal. App.3d 290, is unavailing.  Provencio admitted an anonymous declarant's statement not as a statement against penal interest, but as a spontaneous statement (Evid. Code, § 1240).

As to Estrada, we agree with the People that the only portion of Estrada's statement that was against his penal interest was that he disposed of the gun.  Defendants think this would conflict with evidence that Cervantes said he got rid of the gun by tossing it in the river, because it takes only one person to throw a gun away. However, it is possible for more than one person to be present when a gun is thrown away and for more than one person to claim credit for the toss.

Cervantes argues the jury would have been receptive to evidence of third party culpability, because the jury twice asked why they had not heard from or about what happened to Guillermo Ramirez. However, this does not render the trial court's ruling erroneous or prejudicial.

Under the subheading regarding exclusion of evidence of third party culpability, Cervantes complains the trial court refused a defense request for a jury instruction on third party culpability. However, the trial court did instruct, "The defendants in this case have introduced testimony for the purpose of showing that another person or persons may have committed or been involved in a separate or different conspiracy, to commit the crimes for which these defendants are here on trial.  If, after consideration of all the evidence, you have a reasonable doubt that any or all of these

/////

20

1  defendants committed any of the crimes charged, you must find
   that defendant or those defendants not guilty."

2

3  We conclude defendants fail to show any evidentiary error
   warranting reversal.

4  (Opinion at *37-38.)

5          Whether rooted directly in the Due Process Clause of the Fourteenth Amendment,

6  or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the

7  Constitution guarantees criminal defendants "a meaningful opportunity to present a complete

8  defense" and the right to present relevant evidence in their own defense.  Holmes v. South

9  Carolina, 547 U.S. 319, 324 (2006) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)).

10 This right is not unlimited, but rather is subject to reasonable restrictions.  United States v.

11 Scheffer, 523 U.S. 303, 308 (1998); Taylor v. Illinois, 484 U.S. 400, 410 (1988) (An accused

12 does not have an "unfettered right" to present any evidence he or she wishes); Alcala v.

13 Woodford, 334 F.3d 862, 877 (9th Cir. 2003).  A state evidentiary rule excluding evidence does

14 not abridge a criminal defendant's right to present a defense unless it is "arbitrary or

15 disproportionate" and "infringe[s] upon a weighty interest of the accused."  Scheffer, 523 U.S. at

16 308.  See also Crane, 476 U.S. at 689-91).

17         Evidence of potential third-party culpability must be admitted when, under the

18 "facts and circumstances" of the individual case, its exclusion would deprive the defendant of a

19 fair trial.  Chambers v. Mississippi, 410 U.S. 284, 303 (1973) (exclusion of evidence of third

20 party confession violated due process where the excluded evidence was highly corroborated and

21 the testimony was crucial to the defense); Lunbery v. Hornbeak, 605 F.3d 754, 760-61 (9th Cir.

22 2010) (exclusion of statement by third party that he had killed defendant's husband deprived

23 defendant of the right to present a defense because the "excluded testimony . . . bore substantial

24 guarantees of trustworthiness and was critical to [defendant's] defense").  The United States

25 Supreme court has noted that "rules regulating the admission of evidence proffered by criminal

26 defendants to show that someone else committed the crime with which they are charged . . . are

1   widely accepted[.]"  Holmes, 547 U.S. at 326.  Moreover, the Ninth Circuit has determined that

2   where the proffered evidence of third party culpability simply affords a possible ground of

3   suspicion pointing to a third party and does not directly connect that person with the actual

4   commission of the offense, that evidence may be excluded.  People of Territory of Guam v.

5   Ignacio, 10 F.3d 608, 615 (9th Cir. 1993) (citing Perry v. Rushen, 713 F.2d 1447, 1449 (9th Cir.

6   1983)); see also Walters v. McCormick, 122 F.3d 1172, 1177 (9th Cir. 1997 )("The exclusion of

7   tangential evidence of something that *may* have happened at a different time and place does not

8   constitute a due process violation.")  Under California law, a criminal defendant has a right to

9   present evidence of third party culpability if that evidence is capable of raising a reasonable

10  doubt regarding his own guilt.  See Spivey v. Rocha, 194 F.3d 971, 978 (9th Cir. 1999) (citing

11  People v. Hall, 41 Cal. 3d 826, 833 (1986)).  In order for evidence pointing to another suspect to

12  be admissible, however, "there must be direct or circumstantial evidence linking the third person

13  to the actual perpetration of the crime."  Hall, 41 Cal. 3d at 833.  Motive or opportunity alone is

14  not enough.  Spivey, 194 F.3d at 978 (citing Hall, 41 Cal. 3d at 833).

15          This court agrees with the California Court of Appeal that the evidence of third

16  party culpability proffered by the defense in this case was tenuous and unreliable and, even if

17  believed by the jury, would not necessarily have absolved petitioner of the charged crimes.  As

18  stated by the state appellate court, "[s]ince this case involved an uncharged conspiracy between

19  multiple parties, evidence that others may have been culpable would not tend to show that these

20  defendants were not culpable."  (Opinion at *37.)  The evidence that petitioner argues should

21  have been admitted at his trial, while it may have suggested a possible ground of suspicion

22  pointing to the culpability of others, does not directly connect any particular other person with

23  the actual commission of the charged offenses.  Nor, for the reasons expressed by the California

24  Court of Appeal, did the proffered evidence bear "substantial guarantees of trustworthiness."

25  Lunberry, 605 F.3d at 761.  Further, as noted by the state appellate court, the trial court did not

26  exclude all of the proffered defense evidence of third party culpability and also gave the jurors an

instruction covering that topic.  Given all of these circumstances, the decision of the California Court of Appeal that the state trial court did not err in excluding some of the proffered defense evidence of third party culpability was not contrary to federal law.  See Christian v. Frank, 595 F.3d 1076, 1083-86 (9th Cir. 2010) (exclusion of evidence that a third party admitted to murder was not a violation of due process where there was doubt about the truthfulness of the confessions and whether they were ever made in the first place and the witnesses were unreliable); Spivey, 194 F.3d at 978 (concluding that state trial court did not infringe defendant's constitutional rights by excluding speculative third-party culpability evidence). Cf. Chia v. Cambra, 360 F.3d 997, 1004-08 (9th Cir. 2004) (federal habeas relief granted where several exonerating confessions that bore "strong indicia of reliability" had been excluded from evidence and where those confessions clearly stated that the petitioner had not been involved in the murder at all).  Accordingly, petitioner is not entitled to federal habeas relief on this claim.

C. Exclusion of Testimony of Eyewitness Expert

In his next ground for federal habeas relief, petitioner claims that the trial court violated his right to due process and to present a defense when it excluded the testimony of an eyewitness identification expert offered to "dispute" Jessica Valdez' in-court identification of Cervantes as the shooter.  (Pet. at 69.)  Petitioner argues that the other evidence at trial implicating Cervantes as the shooter was unreliable because it consisted solely of testimony by "jailhouse snitch[es]" and accomplices desperate to avoid a lengthy sentence.  (Id. at 69-70.)  He further argues that the respondent "identifies precious little corroboration here that was independent of the accomplices or the snitch, much less any corroboration that was substantial or reliable." (Id. at 70.)  According to petitioner, because of the unreliability of this corroborating evidence, "anything raising doubts regarding accomplice claims [that] Cervantes was the shooter could impact the entire prosecution case premised upon petitioner's supposed 'order' to Cervantes" to shoot Robert Stepper.  (Id.)  Petitioner argues, in essence, that because testimony that Cervantes was the shooter was so unreliable, testimony by an eyewitness identification

23

expert casting doubt on the in-court identification of Cervantes by Valdez was crucial to his case.

He argues that "absent physical evidence or corroboration from independent witnesses, it cannot

be said these hotly disputed accomplice identifications of Cervantes warranted exclusion of [the

eyewitness expert] testimony – especially without a foundational hearing." (Id. at 70-71.)

The California Court of Appeal rejected these arguments, reasoning as follows:

**H. Exclusion of Eyewitness Identification Expert**

Cervantes and Arellano argue the trial court erred or abused its
discretion in excluding a defense expert on eyewitness
identification. We see no basis for reversal.

Cervantes moved in limine to preclude the surviving victims from
any in-court identification of him as perpetrator, because they were
unable to identify him in prior photo lineups, Valdez misidentified
someone she saw in a store, and in-court identification would result
from suggestibility rather than recollection, in that Cervantes was
the only one left on trial whose photo was included in the lineups.

Cervantes did not obtain a ruling on the motion.

At trial, the prosecutor asked surviving victim Jessica Valdez to
look around the courtroom and see if anyone resembled the
shooter. She identified Cervantes, though she had been unable to
identify him previously. At trial, Valdez said she was mistaken
when she told people at the scene that the shooter wore a white
sweatshirt, rather than the black clothing described by every other
witness. At trial, she was "pretty sure" and then "positive" about
her identification.

Previously, during the investigation, Valdez was unable to pick out
anyone in six photo lineups. She told the grand jury she was
unable to identify anyone but would remember the shooter if she
saw him face-to-face. She told the grand jury the shooter stood
five feet from her. He wore a hood. He was a brown-haired, 17 to
20 year old Hispanic, five feet, eight or nine inches tall, with a
small dark spot under his right eye and no facial hair or glasses.
(Other evidence conflicted with her description and indicated
Cervantes was 28 years old at the time, bald, with a thin
moustache, a little goatee, and glasses.)

At the recess after Valdez's in-court identification, Cervantes's
attorney moved for a mistrial, stating he had not received a hearing
or ruling on his motion and "obviously" was not going to object
during Valdez's testimony.

/////

24

The trial court denied the motion for mistrial, stating, "The lineup in the courtroom was . . . imminently [ sic ] fair.  There were a number of people in the courtroom.  There was nothing suggestive in any way.  And it is clear when an eyewitness sees something in the flesh is much better than looking at photo lineups."

On cross-examination, Valdez admitted she had talked to people about the case and read articles which identified Cervantes as the shooter.

Cervantes proposed to call as a witness Dr. Robert Shomer, an expert on deficiencies in eyewitness identifications of strangers.  The People sought exclusion of the expert, arguing that despite Cervantes's denial of involvement, this was not an eyewitness identification case, because of the conspiracy and other statements implicating Cervantes.

The trial court agreed with the prosecutor and stated, "Here you have significant additional . . .  evidence that points to Mr. Cervantes in addition to Jessica Valdez."  Defense counsel argued that plea-bargained verification was not independent verification.  However, the court said, "There is a whole lot of evidence that connects Mr. Cervantes with this crime independent of Jessica Valdez," though the court said it found her in-court identification "highly powerful and highly credible."  The court also noted the testimony of Easlon and others who saw Cervantes at the scene.

After further argument, the trial court said, "There is a whole lot of evidence that connects Mr. Cervantes with this crime independent of Jessica Valdez.  [¶]  I also found Jessica Valdez's identification of him in court to be highly powerful and highly credible."  The court said, "you have any number of witnesses that have testified that he was to be the shooter, that people saw him walk down the street.  People saw – another witness saw him getting in the car saying I got him, I got him, let's go.  You got significant independent different testimony from different people that tie him to this crime.  [¶]  You can argue in your argument and, well, but they are all coconspirators, they're former defendants, and they're trying to get themselves out of trouble, and that's your argument, but the point is that is still separate evidence of his involvement independent of Jessica's identification in court."  The court concluded, "It is not just an identification type of case.  It is not an identification case.  It is a matter of who do you believe, and what do you believe.  I just don't think this is the type of case that eyewitness testimony from an expert is going to be beneficial or of any use.  I think if you believe her or not, she's credible or she's not, but there is enough independent separate evidence pointing to Mr. Cervantes to not justify bringing in this expert.  It is not necessary."

/////

On appeal, defendants cite People v. McDonald (1984) 37 Cal.3d 351 (overruled on other grounds in People v. Mendoza (2000) 23 Cal.4th 896, 914), which said: "When an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability, and the defendant offers qualified expert testimony on specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be fully known to or understood by the jury, it will ordinarily be error to exclude that testimony." (Id. at p. 377.)

However, the decision to admit or exclude expert testimony on psychological factors affecting eyewitness identification remains primarily a matter within the trial court's discretion, and such evidence will not often be needed. (McDonald, supra, 37 Cal.3d at p. 377.) People v. Sanders (1995) 11 Cal.4th 475, at page 509, held the trial court did not abuse its discretion in excluding the expert, where "[a]lthough eyewitness testimony was a key element of the prosecution's case, . . . [it] was not the only evidence linking the defendant to the crime. The eyewitness identification was corroborated by other independent evidence of the crime and the conspiracy leading to it." (Id. at p. 509.) Sanders went on to say that, in any event, no prejudice appeared and it was not reasonably probable the defendant would have received a more favorable result had the expert evidence been admitted. (Id. 11 Cal.4th at p. 510.) Defense counsel extensively cross-examined the eyewitnesses and argued the weaknesses of eyewitness identification to the jury, and the trial court instructed the jury to consider the various factors in evaluating eyewitness testimony. (Ibid.)

Here too, there was no abuse of discretion, because the in-court identification was not the only evidence linking Cervantes to the crimes, and the identification was corroborated by other independent evidence. In this regard, the independent evidence may come from accomplices. (People v. Jones (2003) 30 Cal.4th 1084, 1112.) Cervantes claims the prosecutor argued to the jury that the eyewitness identification alone sufficed. However, what the prosecutor argued was that the eyewitness identification was "probably" enough, but this was a serious case, which was why the prosecution had presented so much more evidence.

Even assuming abuse of discretion, no prejudice appears. Defense counsel extensively cross-examined Valdez and covered the point in closing argument, and the jury was instructed with CALJIC No. 2.92, factors to consider in proving identity by eyewitness testimony, including whether the witness was able to identify the alleged perpetrator in a photographic lineup.

The exclusion of the eyewitness identification expert does not warrant reversal of the judgment.

26

1    (Opinion at *33-35.)

2           The United States Supreme Court has acknowledged a "traditional reluctance to

3    impose constitutional restraints on ordinary evidentiary rulings by state trial courts." Crane, 476

4    U.S. at  689.  Accordingly, a state court's evidentiary ruling, even if erroneous, is grounds for

5    federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate

6    due process.  Estelle, 502 U.S. at 68-70.[12]  The United States Supreme Court has not "squarely

7    addressed" whether a state court's exercise of its discretion to exclude testimony violates a

8    criminal defendant's right to present relevant evidence.  Moses v. Payne, 555 F.3d 742, 758-59

9    (9th Cir. 2009).  Accordingly, the decision of the California Court of Appeal that the trial court's

10   discretionary evidentiary ruling prohibiting the defense from calling an eyewitness identification

11   did not warrant reversal of petitioner's judgment of conviction is not contrary to or an

12   unreasonable application of clearly established federal law and may not be set aside.  Id.; see also

13   Wright v. Van Patten, 552 U.S. 120, 126 (2008) (relief is "unauthorized" under § 2254(d)(1)

14   when the Supreme Court's decisions "given no clear answer to the question presented, let alone

15   one in [the petitioner's] favor," because the state court cannot be said to have unreasonably

16   applied clearly established federal law); Anguiano v. Morales, No. C 98-4751 SI(PR), 2000 WL

17   630870 at *9 (N.D. Cal. May 2, 2000) (trial court's exercise of discretion under California

18

19          [12]  The state appellate court found that the trial court did not abuse its broad discretion in
20   excluding the proffered defense eyewitness identification expert but went on to conclude that
     even if the ruling was an abuse of discretion, petitioner had failed to establish prejudice.  The
21   trial judge's evidentiary ruling and the basis for it are somewhat puzzling particularly in light of
     Valdez's inability to identify Cervantes from a photo lineup, her inaccurate description of both
22   his features and his clothing on the night in question and the defense motions in limine alerting
     the trial court to these issues and seeking to prohibit her in-court identification testimony.
23   Nonetheless, for the reasons set forth above, no federal constitutional error is presented by the
     evidentiary ruling.  Moreover, to the extent petitioner is claiming that the trial court violated
24   California law in excluding the testimony of the eyewitness identification expert, he is not
     entitled to federal habeas relief.  See Estelle, 502 U.S. at 67-68 (federal habeas relief not
25   available for errors in interpretation or application of state law); Jammal v. Van de Kamp, 926
     F.2d 918, 919-20 (9th Cir. 1991) (petitioner may not challenge evidentiary ruling on ground that
26   it violated state's evidence code; failure to comply with state rules of evidence does not warrant
     federal habeas relief).

1  Evidence Code § 1252 to exclude untrustworthy evidence did not violate defendant's right to

2  present a defense).[13]

3         Assuming arguendo that the state trial court erred in excluding the testimony of

4  the eyewitness identification expert and that error violated petitioner's rights under the U.S.

5  Constitution, petitioner must still show that the error "had a substantial and injurious effect or

6  influence in determining the jury's verdict" and that he suffered actual prejudice, defined as a

7  "reasonable probability" that the jury would have reached a different result but for the error.

8  Clark v. Brown, 450 F.3d 898, 916 (9th Cir. 2006) (citing Brecht v. Abrahamson, 507 U.S. 619,

9  637 (1993)). See also Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (in § 2254 habeas proceeding,

10  the federal court must assess the prejudicial impact of constitutional error under Brecht

11  "substantial and injurious effect" standard).  Petitioner has failed to make this showing.

12         As explained by the California Court of Appeal, in addition to the testimony of

13  Jessica Valdez there was significant other testimony identifying Cervantes as the shooter.  In

14  light of this other evidence, the absence of testimony from an expert on eyewitness

15  identifications, even if it might have cast some doubt on Valdez' in-court identification of

16  Cervantes, would not have had a significant outcome on this trial.  In addition, the jury was

17  clearly alerted to the weaknesses in Valdez' testimony through cross-examination by defense

18  counsel and the jury instruction it received on how to evaluate eyewitness identification

19  testimony.  Under these circumstances, the decision of the California Court of Appeal that

20  petitioner failed to show prejudice with respect to this claim is not contrary to or an unreasonable

21

22         [13]  In the past, the Ninth Circuit applied a "balancing test" to assess the constitutionality
    of a trial court's discretionary decision to exclude evidence.  See Miller v. Stagner, 757 F.2d 988,
23  994–95 (9th Cir. 1985).  However, the Ninth Circuit has now concluded that the Miller balancing
    test "is a creation of circuit law," rather than clearly established Supreme Court precedent, for
24  purposes of § 2254(d)(1).  Moses v. Payne, 555 F.3d 742, 759-60 (9th Cir. 2009).  Therefore,
    the Miller balancing test should not be applied in federal habeas review of a challenge to a state
25  court's exercise of its discretion to exclude testimony pursuant to a state evidentiary rule
    affording such discretion.  Id.  "The AEDPA does not permit [a habeas court] to rely on [the
26  Miller] balancing test to conclude that a state trial court's exclusion of evidence . . . violated
    clearly established Supreme Court precedent."  Id. at 760.

1  application of clearly established federal law.  Accordingly, petitioner is not entitled to federal

2  habeas relief on this claim.

3       D.  Admission of Testimony of Gang Expert

4            In his next claim for relief, petitioner argues that the trial court violated his rights

5  to due process, a fair trial, and to a jury determination on all issues when it allowed a prosecution

6  gang expert to testify on issues of "ultimate guilt, intent, and fact issues on two separate

7  occasions."  (Pet. at 71.)  Petitioner argues that the expert's testimony "consisted of, but was not

8  limited to, powerful testimony which became tantamount to a direct opinion on petitioner's guilt

9  on the gang allegations, gang intent (the nexus to the entire shaky prosecution theory of guilt),

10 and accomplice liability issues."  (Id. at 71-72.)  He also contends that the expert's testimony

11 removed significant questions from the jury, thereby reducing "the burden of proof."  (Id. at 72.)

12 Petitioner argues that the trial court's error was "compounded by jury arguments and a faulty

13 gang instruction (CALJIC No. 2.50)" and resulted in prejudice.  (Id.)  He also argues that, to the

14 extent his trial counsel waived this argument by failing to object at trial, counsel rendered

15 ineffective assistance.  (Id. at 73.)

16          The California Court of Appeal rejected petitioner's arguments in this regard,

17 reasoning as follows:

18          **E. Admission of Evidence-Gang Expert**

19          Arellano contends the trial court abused its discretion in allowing
            the gang expert to testify on two issues of ultimate fact and intent,
20          i.e., gang benefit from the crimes, and natural and probable
            consequences of a gang attack . . . .  We see no grounds for
21          reversal.

22          **1. Gang Benefit**

23          Arellano complains that, in direct examination of the expert, the
            prosecutor framed questions with specific reference to this case,
24          rather than using hypotheticals.  Thus, the prosecutor asked (1)
            why the expert agreed with the allegation that the crime was
25          committed in part for gang purposes; (2) how this killing would
            benefit the Norteños; (3) whether it was a personal benefit for
26          Arellano; and (4) how the Sureños benefitted from this killing.

However, defendants did not object during trial, and the contention is therefore forfeited. (Evid. Code, § 353.)  We decline the request that we consider the matter despite the forfeiture.

Arellano alternatively argues ineffective assistance of counsel for counsel's failure to object.  To prevail, he must show that his counsel's performance fell below professional standards and that a more favorable result was reasonably probable absent the deficiency.  (Strickland v. Washington (1984) 466 U.S. 668, 689; People v. Ledesma (1987) 43 Cal.3d 171, 215-218.)  Arellano argues deficiency and prejudice are shown because the claims are meritorious, the potential for prejudice apparent and, since related objections were raised, there was no tactical reason for counsel not to object.

Arellano says section 29 prohibits an expert from offering an opinion on the ultimate question of intent, knowledge, mental state, or reasonableness.  However, section 29 speaks only about an expert "testifying about a defendant's mental illness, mental disorder, or mental defect . . .," none of which was applicable here.

Insofar as defendants complain the expert testified about an ultimate issue to be decided by the jury, "Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact."  (Evid. Code, § 805.)  Even assuming counsel should have objected, it is inconceivable that defendants would have obtained more favorable verdicts had the questions been framed as hypothethicals.

We see no basis for reversal regarding expert opinion of gang benefit.

**2. Natural and Probable Consequences**

Arellano offers the following quotation from the expert's testimony:

"[Prosecutor]: Do you have an opinion as to whether – well, hypothetical, if a shot caller in the Norteño gang gives an order for a violent assault on an underling, somebody who hasn't been paying their debts or has disrespected that shot caller, it is a natural and probable consequence that somebody may be murdered as a result of that order for violent assault?

"[Cervantes's attorney]: Objection. Calls for a legal conclusion.

"[Arellano's attorney]: Not to mention speculative.

"[Olague's attorney]: Beyond the scope of his expertise.

/////

30

1   "THE COURT: Overruled. All three objections are overruled.

2   "THE WITNESS: Yes, sir.

3   "[Prosecutor] Why?

4   "A Because in my training and experience, as well as my personal
involvement investigating felony assaults, especially dealing with
5   gang members, they will often times use weapons. Their assaults,
again, are often times in retaliation for disrespect. That retaliation
6   usually is an increased assault on the person, and with the fact that
they gain respect by the severity of the assaults they commit and
7   the use of weapons. Often times it is likely anyone that
understands the gang culture is involved in gangs realizes that
8   when he commits an assault, or if someone else within their gang
commits an assault, it is likely to lead to great bodily harm,
9   including death."

10   Arellano argues the expert was wrong, and even Lopez and others
thought murder and attempted murder were unlikely consequences
11   of internal gang disputes. However, defendants were free to argue
the expert was wrong. They were not entitled to exclude the
12   expert's opinion. Arellano argues the expert's opinion intruded
into improper assertions of defendants' mental state and other
13   ultimate facts. However, "[t]estimony in the form of an opinion
that is otherwise admissible is not objectionable because it
14   embraces the ultimate issue to be decided by the trier of fact."
(Evid. Code, § 805.) Arellano argues the expert was unqualified to
15   give an opinion on these matters. However, no one objected on
that basis, and Arellano fails to prove his point on appeal.

16

17   Arellano claims the errors regarding the expert, compounded by
closing arguments to the jury and a faulty gang instruction
(discussed post), were prejudicial. The People agree the prosecutor
18   went too far in closing argument by saying murder would be a
natural and probable consequence of simple assault, whereas the
19   expert's testimony related only to violent assault. However, we do
not accept the concession. Although the prosecutor did make
20   reference to "an assault or assault by means of force," his position
was clear that this was a violent assault by means of force.

21

22   Arellano fails to show grounds for reversal regarding the gang
expert.

23   (Opinion at *26-27.)

24        Respondent argues that the failure of petitioner's trial counsel to object to the

25   testimony of the gang expert with regard to the possible gang benefit from the crimes constitutes

26   a procedural default which precludes this court from considering the merits of this part of

petitioner's claim.  (Doc. No. 16 (hereinafter Answer) at 32-33, 35.)  Under the circumstances

presented here, the court finds that petitioner's claim can be resolved more easily by addressing it

on the merits than on procedural grounds.  Accordingly, the court will assume that petitioner's

claim is not procedurally defaulted.  Lambrix v. Singletary, 520 U.S. 518, 524-25 (1997) (a

reviewing court need not invariably resolve the question of procedural default prior to ruling on

the merits of a claim where the default issue turns on difficult questions of state law); Franklin v.

Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more

complex than the merits issues presented by the appeal, so it may well make sense in some

instances to proceed to the merits if the result will be the same."); Busby v. Dretke, 359 F.3d 708,

720 (5th Cir. 2004) (same).

A writ of habeas corpus will be granted for an erroneous admission of evidence

"only where the 'testimony is almost entirely unreliable and . . . the factfinder and the adversary

system will not be competent to uncover, recognize, and take due account of its shortcomings.'"

Mancuso v. Olivarez, 292 F.3d 939, 956 (9th Cir. 2002) (quoting Barefoot v. Estelle, 463 U.S.

880, 899 (1983)).  Evidence violates due process only if "there are no permissible inferences the

jury may draw from the evidence."  Jammal, 926 F.2d at 920.  Evidence must "be of such quality

as necessarily prevents a fair trial" for its admission to violate due process  Id. (quoting

Kealohapauole v. Shimoda, 800 F.2d 1463, 1465 (9th Cir. 1986)).

Even were this to be such a case, as the Ninth Circuit has observed:

> The Supreme Court has made very few rulings regarding the
> admission of evidence as a violation of due process.  Although the
> Court has been clear that a writ should be issued when
> constitutional errors have rendered the trial fundamentally unfair
> (citation omitted), it has not yet made a clear ruling that admission
> of irrelevant or overtly prejudicial evidence constitutes a due
> process violation sufficient to warrant issuance of the writ

Holley, 568 F.3d at 1101.  Therefore, "under AEDPA, even clearly erroneous admissions of

evidence that render a trial fundamentally unfair may not permit the grant of federal habeas

corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme

1  Court."  Id.  According to these authorities, the state appellate court's rejection of petitioner's

2  due process claim here does not support the granting of federal habeas relief under AEDPA

3  because the trial court's admission of the gang expert's testimony in a trial presenting gang-

4  related issues did not violate any principle of clearly established federal law.  Id.

5          In any event, the admission of the challenged evidence did not deny petitioner a

6  fair trial.  After a review of the record, this court agrees with the California Court of Appeal that

7  the trial court's admission of the testimony of the gang expert would not have had a "substantial

8  and injurious effect" on the verdict.  Brecht, 507 U.S. at 623.  See also Penry v. Johnson, 532

9  U.S. 782, 793-96 (2001).  In light of the trial testimony as a whole, there is no reasonable

10 probability the verdict would have been different if the gang expert's testimony had been

11 excluded.

12          Because any error by the trial court in this regard was therefore harmless,

13 petitioner has failed to demonstrate that his trial counsel rendered ineffective assistance in failing

14 to object to the testimony of the gang expert.  See Strickland v. Washington, 466 U.S. 668, 694

15 (1984) (to support a claim of ineffective assistance of counsel, a petitioner must show deficient

16 performance and prejudice, defined as "a reasonable probability that, but for counsel's

17 unprofessional errors, the result of the proceeding would have been different."); see also Richter,

18 131 S. Ct. 788 ("When § 2254(d) applies, the question is not whether counsel's actions were

19 reasonable. . . [but] whether there is any reasonable argument that counsel satisfied Strickland's

20 deferential standard.").

21          Accordingly, for the foregoing reasons, petitioner is not entitled to federal habeas

22 relief on his claims of error related to the admission of the gang expert's testimony at his trial.

23     E.  Putting a Non-Testifying Accomplice (Marten) Before the Jury

24          In his next ground for relief, petitioner claims that the trial court violated his

25 rights to due process of law, a fair trial, and to confront the witnesses against him when it

26 allowed Christina Marten, a convicted accomplice, to be called as a witness at his trial and seated

33

in the witness box "in jail garb," knowing that she would refuse to testify.  (Pet. at 73.)
Petitioner argues that Ms. Marten' appearance before the jury was prejudicial to his case and that
the trial court's limiting instruction could not neutralize the prejudice flowing therefrom.  (Id. at
74.)  He contends that "one limiting instruction cannot erase powerful implications the
prosecution had an intimate, independent (non-pleading) accomplice to bolster otherwise shaky
accomplice/informant testimony."  (Id. at 75.)  Petitioner argues that "there was no reason
whatsoever to allow the prosecution to call a convicted conspirator who was refusing to testify,
then abruptly tell jurors not to consider the appearance."  (Id.)  He also contends that it was
unnecessary and inappropriate for the prosecutor to call Marten to the stand for the purpose of
showing that he tried to use her as a witness, because the jurors were instructed that they should
not speculate as to why other potential accomplices were not called as witnesses.  (Id.)  Petitioner
summarizes his claim on this point as follows:

> Considering references to prior proceedings throughout this case,
> made it impossible for jurors to not infer Marten was an
> independent (non-pleading, non-informant) defendant and intimate
> of petitioner who (as the prosecutor stressed . . .) admitted she set
> Stepper up and led him to his death; was an accomplice as a matter
> of law; undoubtedly had outside information confirming the
> accomplice conspiracy claims; had probably been convicted
> already; and was now refusing to reveal her independent outside
> knowledge, probably out of fear or favor of petitioner or his gang.
> She was called for something; limiting instructions just do not
> erase implications of withheld outside corroboration that are this
> strong.

(Id.)

The California Court of Appeal rejected petitioner's contention, reasoning as
follows:

**1. Calling Marten to the Witness Stand**

Arellano contends the trial court erred in permitting the prosecutor
to "parade" Marten before the jury in jail garb (she already had
been found guilty in her severed trial), knowing she would refuse
to testify, and the error denied Arellano due process, a fair trial,
and the right to confront witnesses.  Even assuming Marten was in

34

jail garb (an assertion unsupported by any citation to the record),
we see no grounds for reversal.

In response to defense in limine objections, the prosecutor said he
would not "make any statements about [Marten's] testimony
whatsoever" in opening statements if no deal had been reached
with Marten.  The prosecutor said, "we don't intend to mention
Christina Marten in our opening unless we have already made a
deal, *as far as what she would say*."  (Italics added.)

In his opening statement, the prosecutor described the roles various
people played in the crime, and said, "Christina Marten was Robert
Stepper's friend.  It was her job to make sure that Stepper went
where he was supposed to go, that he walked into the ambush.  [¶]
... [¶]  Now, as I mentioned, Richard[,] Nate and Gilberto have all
made deals and will testify.  As far as Christina Marten goes, we
intend to call her as a witness.  No deals have been made with
Christina Marten."

At the recess, defense counsel moved for a mistrial and asked the
court to cite the prosecutor for misconduct for mentioning Marten.
The prosecutor said he kept his promise, which was that he would
not disclose the substance of Marten's past statements and
expected testimony.  The court deferred the matter.

Later during trial, Marten's attorney said Marten refused to testify
in defendants' trial.  The prosecution said she had no choice.  Her
trial was over and, though her appeal was pending, the prosecutor
intended to grant her immunity for anything she said in this trial.  If
she refused to testify, she could be held in contempt (though it
would not matter, since she already was serving a sentence of life
in prison without possibility of parole).  The jury was entitled to
see her and observe her.

Defense counsel argued Marten retained a Fifth Amendment right
while her appeal was pending, and they invoked case law that the
better practice is to have a witness invoke the Fifth Amendment
outside of the jury's presence.  The prosecutor said she could
invoke the Fifth Amendment outside of the jury's presence, and
then he would grant her immunity and call her as a witness.
Arellano's lawyer said Marten would refuse to be sworn.  The
prosecution called Marten to the stand, outside of the jury's
presence.  She refused to take the stand and refused to take the
oath.

After further discussion, Marten was called as a witness in front of
the jury and refused the court's order to be sworn in.  The court
instructed the jury (consistent with section 913), "You, the jury, are
not, and may not, speculate or draw any inference from the
exercise of her refusal to be sworn as a witness.  You may not draw
any inference or speculate as to the credibility of any witness or as

to any matter at issue in the trial.  You must disregard that in its total."

Out of the presence of the jury, the trial court said, "Normally we wouldn't let you call her.  I let you call her in this case because under the particular circumstances of this case I felt then and I still do, she is a material witness, her name has been bandied about all the way through this trial.   [¶]  The jury had a right to understand at least the district attorney made a good faith effort to call her.  That is the end of it.  Otherwise I wouldn't have let you call her at all."

On appeal, the defense contention is that there was no reason whatsoever to allow the prosecution to call a convicted conspirator who was refusing to testify, then abruptly tell the jurors not to consider the appearance.  Arellano does not cite evidence that the jury was told Marten was already convicted; rather, he says the jurors could not help but infer that she had probably been convicted already.  Arellano argues, "Evidence Code section 352, section 913, and case law preclude parading witnesses asserting the Fifth Amendment before the jury; if it does occur, a limiting instruction is required upon request."  Although Marten did not invoke the Fifth Amendment (she refused to be sworn in), defendant argues it should be treated the same.

However, a limiting instruction was given in this case, and none of Arellano's cited authorities supports reversal.

Thus, Evidence Code section 352 gives the trial court discretion to exclude evidence that is more prejudicial than probative.  Section 913 says counsel may not comment on, and the trier of fact may not draw any inference from an exercise of a privilege as to the credibility of the witness or any matter at issue in the proceeding. Arellano cites People v. Frierson (1991) 53 Cal.3d 730, where the defendant in the penalty phase of a capital murder case claimed a third party, rather than defendant, committed a prior murder. Outside the jury's presence, the third party asserted the privilege. The trial court denied a defense request to have the person assert the privilege in front of the jury.  The defense nevertheless called the person as a witness, and he asserted the privilege in front of the jury.  Despite getting what he wanted, the defendant argued on appeal that the trial court erred in its ruling.  The Supreme Court said, "Allowing a witness to be put on the stand to have the witness exercise the privilege [against self-incrimination] before the jury would only invite the jury to make an improper inference. [Citations.]  Therefore, 'it is the better practice for the court to require the exercise of the privilege out of the presence of the jury.'  [Citation.]" (Frierson, supra, 53 Cal.3d at p. 743.)  The Supreme Court has commended this approach as a means by which to avoid the potentially prejudicial impact of the witness asserting the

/////

36

1    privilege before the jury.  (Ibid.)  However, Frierson found no
     prejudice warranting reversal.
2
     The other cases cited by Arellano (without discussion) do not help
3    him. (Namet v. United States (1963) 373 U.S. 179 [10 L.Ed.2d
     278] [no prejudicial error under the circumstances]; Bowles v.
4    United States (D.C. Cir. 1970) 439 F.2d 536, 541-542 [no error in
     trial court's directive that counsel refrain from mentioning that
5    witness invoked the Fifth Amendment outside the jury's presence];
     United States v. Maloney (2d Cir. 1959) 262 F.2d 535, 538
6    [reversed because no limiting instruction was given].)

7    Here, Arellano fails to show any prejudicial impact in this case.
     He claims jurors could not help but infer Marten was an
8    independent (non-pleading, non-informant) defendant and intimate
     of Arellano who (as the prosecutor stressed) admitted she set up
9    Stepper and led him to his death; was an accomplice as a matter of
     law; doubtless had outside information confirming the accomplice
10   conspiracy claims; had probably been convicted already; and was
     refusing to reveal her independent outside knowledge, probably out
11   of fear or favor of Arellano or his gang.  However, the factual
     matters were adduced through other evidence, the claimed
12   inferences are speculative overreaching by Arellano, and the court
     gave the jury the limiting instruction.
13

14   (Opinion at *17-19.)

15           As explained above, federal habeas relief is not available for alleged error in the

16   application of state law, and habeas corpus cannot be utilized in federal court to try state issues

17   de novo.  Wilson, 131 S. Ct. at 16; Milton v. Wainwright, 407 U.S. 371, 377 (1972);

18   Waddington v. Sarausad, 555 U.S. 179, 192 n.5 (2009); Rivera v. Illinois, 556 U.S. 148, 158

19   (2009); Bradshaw v. Richey, 546 U.S. 74, 76 (2005); Lewis v. Jeffers, 497 U.S. 764, 780 (1990).

20   Absent some federal constitutional violation, a violation of state law does not provide a basis for

21   federal habeas relief.  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); Jammal, 926

22   F.2d at  919 (9th Cir. 1991) ("The issue for us, always, is whether the state proceedings satisfied

23   due process; the presence or absence of a state law violation is largely beside the point.").

24           Accordingly, to the extent petitioner's claim is based on an alleged violations of

25   California law, he is not entitled to federal habeas relief.  Rather, the only question before the

26   /////

1  court in this proceeding is whether calling Marten to the witness stand deprived petitioner of his

2  right to a fair trial or his right to confront the witnesses against him.

3          It has been suggested that under federal law compelling a witness to testify

4  knowing that the witness will invoke the Fifth Amendment privilege may require reversal of a

5  conviction if: (1) the Government makes "a conscious and flagrant attempt to build its case out of

6  inferences arising from use of the testimonial privilege;" or (2) inferences from a witness' refusal

7  to answer added "critical weight to the prosecution's case in a form not subject to cross-

8  examination." United States v. Peterson, 549 F.2d 654, 658-59 (9th Cir. 1977) (quoting Namet

9  v. United States, 373 U.S. 179, 186-87 (1963)).  But see United States v. Castillo, 615 F.2d 878,

10  884 (9th Cir. 1980) ("The possibility of an adverse inference being drawn is, however,

11  aggravated where the prosecution suggests that the jury find a witness' invocation of the Fifth

12  Amendment to be the equivalent of an affirmative answer to a potentially incriminating question.

13  . . . The error as to the defendant is not of a constitutional dimension.")  "It is said that when a

14  witness is asked whether he participated in criminal activity with the defendant, a refusal to

15  answer based on the privilege against self-incrimination tends to imply to the jury that a truthful

16  answer would be in the affirmative." Namet, 373 U.S. at 185-86.  See also Douglas v. Alabama,

17  380 U.S. 415, 419 (1965) (constitutional right to confrontation violated where prosecutor

18  allowed to call recalcitrant witness to the stand, witness refused to answer questions and

19  prosecutor presented a prior statement made by the witness to police implicating the defendant in

20  the crime's commission which was the only such direct evidence against the accused).

21          However, courts have declined to find reversible error when such episodes were

22  "no more than minor lapses through a long trial." Namet, 373 U.S. at 187.  Further, "even when

23  the objectionable inferences might have been found prejudicial, it has been held that instructions

24  to the jury to disregard them sufficiently cured the error." Id.  Among the factors which courts

25  take into account in reviewing such a claim are: "the prosecutor's intent in calling witness, the

26  number of questions which he asks, the importance of the questions to his case, whether there is

1   a reference to the testimony in the closing argument, and whether or not the judge gives a

2   curative instruction." Moynahan v. Manson, 419 F. Supp. 1139, 1149 (D. Conn. 1976).

3          In Namet, the defendant and two other persons were charged with violations of

4   federal wagering tax laws.  On the date set for trial, his co-defendants changed their pleas to

5   guilty and were subpoenaed to appear at his trial.  At trial, the prosecutor asked those witnesses

6   incriminating questions concerning their relationship with the defendant, knowing that they

7   would invoke their privilege against self-incrimination.  The petitioner claimed that the trial court

8   committed reversible error in permitting the prosecutor to question the witnesses after it was

9   known that they would claim their Fifth Amendment privilege.  Namet, 373 U.S. at 185-86.

10         The Supreme Court concluded that under the circumstances of that case

11   petitioner's conviction should not be set aside, either on the basis of prosecutorial misconduct or

12   unfair prejudice.  The court reasoned that: (1) the prosecutor may not have believed the witnesses

13   when they claimed they would invoke their Fifth Amendment privilege if questioned; (2) the

14   witnesses possessed "nonprivileged information that could be used to corroborate the

15   government's case," which the government "had a right to put . . . before the jury;" (3) the

16   testimony of one of the witnesses occurred before the trial court ruled the witness had a limited

17   testimonial privilege; and (4) the prosecutor asked only four questions that were held to be

18   privileged.  Id. at 188-89.  The Supreme Court found that "these few lapses, when viewed in the

19   context of the entire trial, [did not amount to] planned or deliberate attempts by the Government

20   to make capital out of witnesses' refusals to testify." Id. at 189.  The court also concluded that

21   "the few invocations of privilege by the [witnesses] were [not] of such significance in the trial

22   that they constituted reversible error even in the absence of prosecutorial misconduct." Id.

23         In United States v. Maloney, 262 F.2d 535 (2nd Cir. 1959), a conviction was

24   reversed where the prosecutor: (1) called two key witnesses to the stand anticipating that they

25   would invoke their privilege against self-incrimination; (2) questioned the witnesses about

26   significant issues in the case; and (3) made use in his closing argument of the adverse inferences

1    to be drawn from the witnesses' refusal to testify.  The witnesses' refusal to testify in that case

2    was the only source of the inference that the witness had engaged in criminal activity with the

3    defendant.  Id. at 538.  Further, the trial court did not give a cautionary instruction to the jurors

4    that they must not use the witnesses' refusal to answer as evidence of what the answers would

5    have been.  Id.

6            The facts in this case do not constitute a "conscious and flagrant" attempt by the

7    government to build its case on Marten's refusal to take the stand.  Namet, 373 U.S. at 186-87;

8    Peterson, 549 F.2d at 658-59.   Here, Marten was not asked any questions by the prosecutor and

9    did not invoke her Fifth Amendment privilege in front of the jury.  Rather, she simply refused to

10   take the stand at petitioner's trial.  Further, even though the prosecutor knew that Marten planned

11   to invoke her Fifth Amendment privilege, this prior knowledge alone does not require a finding

12   of prosecutorial misconduct.  See Cota v. Eyman, 453 F.2d 691, 694-95 (9th Cir. 1971)

13   (petitioner's conviction not reversed where, although the prosecutor called a witness knowing he

14   would assert his Fifth Amendment privilege not to testify, "the only comment thereon in

15   summation was a terse, 'Pedro Valenzuela who refused to testify,' with no solicitation that the

16   jury draw any inference against appellant").  Petitioner does not point to anything in the record to

17   suggest that the prosecutor attempted to build his case on references to Marten's refusal to take

18   the stand.  Under these circumstances, there is no basis for a finding of prosecutorial misconduct.

19   See Skinner v. Cardwell, 564 F.2d 1381, 1390 (9th Cir. 1977) (no error in allowing prosecutor to

20   call a witness who asserted his Fifth Amendment privilege where prosecutor did not know for

21   sure whether witness would assert the privilege and "the brevity of the questioning and the

22   relative neutrality of the questions asked preclude a finding that the defendant was unfairly

23   prejudiced").  Cf. Cain v. Cupp, 442 F.2d 356, 358 (9th Cir. 1971) (conviction reversed where a

24   prosecutor who had been notified that a prospective witness would take the Fifth Amendment

25   nevertheless called the witness to testify, but promptly excused the witness when he invoked the

26   privilege, but in closing argument commented at length on and asked the jury to draw

40

1   unfavorable inferences from the exercise of the privilege); Robbins v. Small, 371 F.2d 793 (1st

2   Cir. 1967) (prosecutor's repeated questions posed to a witness who claimed the Fifth

3   Amendment privilege after each question, deprived defendant of right to confrontation).

4           Nor has petitioner demonstrated that he suffered prejudice as a result of calling

5   Marten to the witness stand.  This is not a case in which "a witness' refusal to testify is the only

6   source, or even the chief source, of the inference that the witness engaged in criminal activity

7   with the defendant."  Namet, 373 U.S. at 189.  Rather, as explained by the California Court of

8   Appeal, Marten's refusal to testify was merely "cumulative support" for inferences already

9   established through witnesses who were subject to cross-examination.  See, e. g., United States v.

10  Porchay, 651 F.3d 930, 943 (8th Cir. 2011) (no prejudice shown where the appearance of the

11  witness was "ineffectual" and the government did not try to use the invocation to create a

12  negative inference against the defendant); Cota, 453 F.2d at 695; United States v. Roselli, 432

13  F.2d 879, 903 (9th Cir. 1970) (no prosecutorial misconduct in calling witness who asserted the

14  Fifth Amendment privilege where there no evidence the prosecutor attempted to build its case

15  out of inferences arising from use of the privilege or to exploit the situation; witness' failure to

16  testify did not add "critical weight" to prosecution case because there was other trial evidence

17  concerning the matters to which the witnesses' testimony might have related; the incident

18  comprised "two or three pages in a transcript of over sixteen thousand pages," and the jury was

19  given a curative instruction).  As noted above, petitioner does not claim that the prosecutor made

20  any reference to Marten's refusal to take the stand in his closing argument to the jury.  Moreover,

21  the trial judge in this case gave a curative instruction in which he informed the jury that:

22              . . . the witness, Christina Marten, has refused to be called and
                refused to take an oath as a witness in this case.  You, the jury, are
23              not, and may not, speculate or draw any inference or speculate as to
                the credibility of any witness or as to any matter at issue in the
24              trial.  You must disregard that in its total.

25  (RT at 9394.)  This instruction was sufficient under the circumstances.  See Brown v. Small, No.

26  C 08-5529 CW (PR), 2011 WL 482766, at *7 (N.D. Cal. Feb. 7, 2011) (federal habeas relief

denied where, among other factors, the trial court instructed the jury that the questioning had no evidentiary value); Betancourt v. Hedgpeth, No. ED CV 08-1076 DOC (RZ), 2010 WL 3447499, at *22-23 (C.D. Cal. July 13, 2010) (even where it was conceded that the prosecutor improperly implied to jury that the witness invoking the privilege had given a prior statement to police, federal habeas relief was unavailable because of lack of prejudice in light of other trial testimony and the trial court's curative instructions) .

Under the circumstances of this case, and for the reasons set forth above, this court cannot find that petitioner was denied a fundamentally fair trial or that the trial court violated any of petitioner's federal constitutional rights when it allowed the prosecutor to call Marten to the witness stand at trial, knowing that she would refuse to testify.  Accordingly, petitioner is not entitled to federal habeas relief on this claim.

F.  Admission of Marten's Statement to her Father

In his next ground for federal habeas relief, petitioner claims that the trial court violated his right to due process and to confront the witnesses against him when it ruled that statements made by Christina Marten to her father were admissible as a declaration against Marten's penal interests.  (Pet. at 76-77.)  Petitioner also argues that the trial court's ruling violated state evidentiary rules regarding the admissibility of hearsay evidence and resulted in prejudice.  (Id.)  He summarizes his claim as follows:

> Under any standard, admission of one more suspect accomplice statement was an important hook for the prosecutor.  Setting aside Marten's parade before the jury, this untested statement was urged as more reliable, early, and independent confirmation of a shaky murder conspiracy and shaky accomplice testimony from a non-pleading accomplice.  It is improper admission – even just the claim Olague and Cervantes were right there – cannot be considered harmless under any standard.

(Id. at 77.)

The California Court of Appeal explained the background to this claim, and its rejection of petitioner's argument, as follows:

## 2. Marten's Declaration Against Interest

Arellano also complains the trial court admitted into evidence, as a declaration against interest, Marten's hearsay statement to her father implicating herself.  We see no error.

After the trial court found Marten unavailable as a witness, it allowed the prosecution to adduce evidence (over defense objection) from Marten's father that, after Marten testified before the grand jury, she told him that she told the grand jury that she set up victim Stepper by walking him to the place where he would be assaulted.  The father admitted he testified in an earlier proceeding that Marten also said, "Oscar [Cervantes] and James [Olague] were in front of her, right behind her [ sic ]."  The father said he started crying, and she immediately retracted her statements and said she was taking a shower when the shots were fired and knew nothing about it.  At the time of the shootings, Marten lived on the streets because she could not live with her father's no-drug policy.  She does drugs and does not always tell the truth.  The father said Marten said she lied to the grand jury in an attempt to help herself get out of jail.  In admitting the evidence, the trial court found reliability, stating she would not have implicated herself to her father if it were not true.

The proponent of a declaration against penal interest (Evid. Code, § 1230[14]) must show the declarant is unavailable, the declaration was against the declarant's penal interest when made, and the declaration was sufficiently reliable to warrant admission despite its hearsay character.  (People v. Duarte (2000) 24 Cal.4th 603, 610-611.)  People v. (Ubaldo) Cervantes (2004) 118 Cal. App.4th 162, said there is some disagreement as to whether a ruling on a declaration against interest should be reviewed for abuse of discretion or de novo review of the totality of the circumstances. (Id. at p. 174.)  Applying the standard more favorable to defendants, we see no error.

Arellano argues the standard was not met because Marten was not confiding in her father but was merely repeating what she said to the grand jury (which she immediately told him was false).  However, she was repeating a statement made under oath.  Arellano argues Marten did not subject herself to any increased liability by merely repeating a statement she had already given to authorities.  However, the cases cited by Arellano (without

---

[14]  Evidence Code section 1230 states, "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."

43

discussion) do not require that a declaration against interest increase liability.  (People v. Jackson (1991) 235 Cal. App.3d 1670, 1678; People v. Blankenship (1985) 167 Cal. App.3d 840, 848 [trial court properly precluded defendant from testifying that his cellmate, awaiting trial on a different robbery/murder, admitted committing the crime]; People v. Shipe (1975) 49 Cal. App.3d 343, 354 [dictum: reliability lacking where declarant made statement after arrest for serious offense or guilty plea to lesser offense and is awaiting sentencing and statement is exculpatory in the sense declarant admits complicity to lesser degree and blames coparticipant for a greater offense].)

Arellano argues the prosecutor erroneously urged external corroboration as grounds for special reliability.  Arellano apparently refers to the prosecutor's comment, "Certainly more than enough [was] presented in trial to back up the reliability of that statement."  However, that comment was made after the trial court already ruled and after the court answered "yes" to defense counsel's request for confirmation that the court found the statement trustworthy.

In addition to implicating herself, Marten's statement also implicated "Oscar and James" (Cervantes and Olague).  Cervantes and Arellano (with joinder by Olague) contend that declarations against penal interest should be limited to declarations against the interests of the declarant and should not extend to collateral assertions against others.  The defense raised this point in the trial court, where they argued Marten's declaration against interest would be admissible only as against her, and her statement implicating these defendants should be redacted under Bruton v. United States (1968) 391 U.S. 123 [20 L.Ed.2d 476] and People v. Aranda (1965) 63 Cal.2d 518.

However, on appeal, defendants fail to acknowledge and address the authority cited by the People in the trial court and on appeal – Cervantes, supra, 118 Cal. App.4th 162 – which held admissible, as a declaration against interest, one defendant's hearsay statement to a friend, attributing blame to the codefendants but accepting for himself an active role in the crimes.  (Id. at p. 175.)  His statement that a codefendant shot the first male, as well as his statement that he (the declarant) shot at the second male, both incriminated the declarant, because he was acting in concert with the codefendant at all relevant times.  (Id. at p. 176.)  A declaration against interest may be admitted in a joint trial so long as the statement satisfies the statutory definition and otherwise satisfies the constitutional requirement of trustworthiness.  (Id. at p. 177.)

Here, Marten's statement about Oscar and James being there did not expressly assert they were involved.  To the extent the statement implied they were involved, the statement was against

/////

44

1            Marten's own penal interest because she was working in concert
           with them.
2

3            We conclude the entire statement was properly admitted as a
           declaration against interest.

4            Even assuming for the sake of argument that the evidence should
           have been excluded, any error was harmless. (People v. Samuels
5            (2005) 36 Cal.4th 96, 121 [applying Watson standard].) Others
           testified they saw Cervantes do the shooting, and Olague made
6            admissions to a jail mate connecting himself to the murders.

7            We see no reversible evidentiary error regarding Marten.

8 (Opinion at *19-21.)

9            The state appellate court's conclusion that the testimony of Marten's father met

10 the requirements for admissibility as a hearsay exception under the California Evidence Code is

11 binding on this court. See Estelle, 502 U.S. at 67-68 (a federal writ is not available for alleged

12 error in the interpretation or application of state law); Rhoades v. Henry, 638 1027, 1034, n.5

13 (9th Cir. 2011) ("[E]videntiary rulings based on state law cannot form an independent basis for

14 habeas relief."); Jammal, 926 F.2d at 919-20 (petitioner may not challenge evidentiary ruling on

15 ground that it violated states's evidence code; failure to comply with state rules of evidence does

16 not warrant federal habeas relief); see also Aponte v. Gomez, 993 F.2d 705, 707 (9th Cir. 1993)

17 (federal courts are "bound by a state court's construction of its own penal statutes").

18 Accordingly, petitioner's argument that the trial court erred in applying the California Evidence

19 Code must be rejected in these federal habeas proceedings.

20            Petitioner has also failed to demonstrate that the trial court's ruling admitting the

21 testimony of Marten's father violated his constitutional right to due process. As explained above,

22 a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it

23 renders the state proceedings so fundamentally unfair as to violate due process. Estelle, 502 U.S.

24 at 68-70. Here, as noted by the California Court of Appeal, there was other evidence, apart from

25 the testimony of Marten's father, that Cervantes and Olague were involved in the murders and

26 that Christina Marten led the victim to where she knew he would be assaulted. Testimony from

45

Marten's father to the same effect was cumulative to this other evidence and did not render

petitioner's trial fundamentally unfair.

Nor has petitioner demonstrated that his Sixth Amendment right of confrontation

was violated by the admission into evidence of Christina Marten's statements to her father

without petitioner having an opportunity to cross-examine her.  The Sixth Amendment to the

United States Constitution grants a criminal defendant the right "to be confronted with the

witnesses against him."  U.S. Const. amend. VI.  "The 'main and essential purpose of

confrontation is to secure for the opponent the opportunity of cross-examination.'"  Fenenbock v.

Director of Corrections for California, 681 F.3d 968, 976 (9th Cir. 2012) (quoting Delaware v.

Van Arsdall, 475 U.S. 673, 678 (1986)).

In 2004, the United States Supreme Court held that the Confrontation Clause bars

the state from introducing into evidence out-of-court statements which are testimonial in nature

unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the

witness, regardless of whether such statements are deemed reliable.  Crawford v. Washington,

541 U.S. 36 (2004).[15]  The Crawford rule applies only to hearsay statements that are

"testimonial" and does not bar the admission of non-testimonial hearsay statements.  Id. at 42,

51, 68.  See also Whorton v. Bockting, 549 U.S. 406, 420 (2007) ("the Confrontation Clause has

no application to" an "out-of-court nontestimonial statement.")  Although the Supreme Court in

Crawford declined to provide a comprehensive definition of the term "testimonial," it stated that

"[s]tatements taken by police officers in the course of interrogations are . . . testimonial under

even a narrow standard."  Crawford, 541 U.S. at 52.  The court also provided the following

"formulations" of a "core class" of testimonial statements: (1) "ex parte in-court testimony or its

---

[15]   The Crawford decision applies to this case because that decision was rendered prior
to petitioner's appeal.  Whorton v. Bockting, 549 U.S. 406, 416 (2007) (A new rule, such as that
announced in Crawford, "is generally only applicable to cases that are still on direct review.")
Winzer v. Hall, 494 F.3d 1192, 1194 (9th Cir. 2007) (Crawford did not apply "because it was
decided after [petitioner's] trial and appeal.")

1    functional equivalent – that is, material such as affidavits, custodial examinations, prior

2    testimony that the defendant was unable to cross-examine, or similar pretrial statements that

3    declarants would reasonably expect to be used prosecutorially;" (2) "extrajudicial statements . . .

4    contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or

5    confessions;" and (3) "statements that were made under circumstances which would lead an

6    objective witness reasonably to believe that the statement would be available for use at a later

7    trial."  Id. at 51-52.[16]

8              Respondent argues that the testimony of Marten's father was not "testimonial"

9    and that, for this reason, the Confrontation Clause does not bar his testimony.  (Answer at 44-45.)

10   This court agrees.  Marten's statements to her father were not made under circumstances which

11   would lead an objective witness to believe they would be available for later use at a trial; they

12   were not made to a law enforcement officer, as was the case in Crawford; nor do they fall within

13   the "per se" examples of testimonial evidence offered by the Supreme Court in Crawford, which

14   all involve out-of-court statements elicited by a government officer with a view to prosecution.

15   Rather, Marten made her statements to a family member during a private and personal

16   conversation, with no expectation that her remarks would be used by a prosecutor at a later trial.

17   Under these circumstances, Marten's statements to her father were not testimonial, as defined in

18   Crawford.  See Jensen v. Pliler, 439 F.3d 1086 (9th Cir. 2006) (statements made by declarant to

19   his attorney were non-testimonial and therefore not barred by the Confrontation Clause); United

20   States v. Manfre, 368 F.3d 832, 838 n.1 (8th Cir. 2004) (statements made by declarant to family

21   members were not "testimonial" because they were "not the kind of memorialized, judicial-

22   process-created evidence of which Crawford speaks"); Gonzales v. Clark, No. CV 08-02251-AG

23   (VBK), 2009 WL 3233906, *8 (C.D. Cal. Sept. 30, 2009) (petitioner's private statements to his

24

25        [16]  The disputed statements in Crawford were made and recorded while the witness was in
     police custody, after having been given Miranda warnings because of her status as a possible
26   suspect.  The Supreme Court held that statements made under those circumstances qualified as
     "testimonial . . . under any definition."  541 U.S. at 52.

1   aunt was not testimonial in nature).  Because Christina Marten's statements to her father were not

2   "testimonial," their admission into evidence at petitioner's trial was not precluded by the

3   Supreme Court's holding in Crawford.

4        In any event, any error by the trial court in admitting this evidence was harmless.

5   Confrontation Clause violations are subject to harmless error analysis.  Whelchel v. Washington,

6   232 F.3d 1197, 1205-06 (9th Cir. 2000).  "In the context of habeas petitions, the standard of

7   review is whether a given error 'had substantial and injurious effect or influence in determining

8   the jury's verdict.'"  Christian v. Rhode, 41 F.3d 461, 468 (9th Cir. 1994) (quoting Brecht, 507

9   U.S. at 637).  Factors to be considered when assessing the harmlessness of a Confrontation

10  Clause violation include the importance of the testimony, whether the testimony was cumulative,

11  the presence or absence of evidence corroborating or contradicting the testimony, the extent of

12  cross-examination permitted, and the overall strength of the prosecution's case.  Delaware v. Van

13  Arsdall, 475 U.S. 673, 684 (1986)[17]; United States v. Norwood, 603 F.3d 1063, 1068-69 (9th

14  Cir.), cert. denied ___ U.S.___, 131 S. Ct. 225 (2010).

15       Here, as explained above, Marten's statements to her father were cumulative to

16  other evidence introduced at petitioner's trial.  The testimony of Marten's father spanned a small

17  fraction of the 15,000 page transcript of petitioner's trial.  Under these circumstances, the

18  admission of this evidence would not have had a substantial and injurious effect or influence on

19  the verdict in this case.  Accordingly, petitioner is not entitled to federal habeas relief with

20  respect to this claim.

21  /////

22  /////

23  /////

24

25       [17]  Although Van Arsdall involved a direct appeal and not a habeas action, "there is
26  nothing in the opinion or logic of Van Arsdall that limits the use of these factors to direct
    review."  Whelchel, 232 F.3d at 1206.

48

G. Refusing to Instruct the Jury on Prosecutorial Misconduct (Doyle Error)/Denial of Motion for New Trial

In his next ground for relief, petitioner argues that the trial court violated his Fourteenth Amendment right to due process and his Fifth Amendment right to remain silent in failing to instruct the jury that the prosecutor had committed misconduct in commenting on petitioner's post-arrest silence. (Pet. at 10, 77-80.) Petitioner also argues that the trial court violated his federal constitutional rights in denying his motion for new trial based on these same grounds. (Id. at 77.) The California Court of Appeal rejected petitioner's arguments in this regard, reasoning as follows:

**H. Instruction Re Asserted Doyle Misconduct**

Arellano argues the trial court erred in refusing to instruct the jurors about the prosecutor's misconduct in cross-examining Arellano about his trial testimony denying pre-Halloween acquaintance with Betancourt. Arellano says the prosecutor questioned him about his failure to deny the acquaintance during the three years after his last interview with the police, at which time Arellano had invoked his right to remain silent. Arellano also claims the court erred in denying his related motion for new trial based on this point. We see no basis for reversal.

Prosecutorial comment on a defendant's silence is prohibited by Doyle v. Ohio (1976) 426 U.S. 610 [49 L.Ed.2d 91], because it infringes on the defendant's right to remain silent. Doyle error is reviewed for prejudice under a Chapman standard. (People v. Earp (1999) 20 Cal.4th 826, 857-858.)

Here, Arellano did speak with police in November and December 2002, but he later invoked his right to remain silent when they tried to re-interview him.[18]

In his trial testimony, Arellano said he met Richard Betancourt for the first time in late 2002, after Halloween. On cross-examination, the prosecutor asked Arellano to acknowledge he never mentioned this fact before. He said he did not remember. The prosecutor asked Arellano to acknowledge he never mentioned it when he spoke with the police in 2002 or 2003. Arellano dodged the questions and said he did not remember. The prosecutor

---

[18] The jury saw a videotape of a November 4, 2002, police interview with Arellano.

49

mentioned the jury had tapes of the police interviews and asked, "Have you ever said this before today? . . . I'm talking about law enforcement or this Court." Arellano said, "I don't think I was never [sic] asked that question."

The prosecutor also cross-examined about Arellano making reference for the first time at trial to a Mr. Zarete as having introduced Arellano to Betancourt in late 2002. The prosecutor asked if Arellano had ever "before today" mentioned this to anybody in law enforcement or in court. Arellano did not remember.

The prosecutor then asked Arellano whether he was in custody since 2003 and knew Betancourt would be a prosecution witness. Defendants objected on the grounds Arellano was represented by counsel, and the defense was not required to prove anything. The court instructed the jury the defense had no obligation to present any evidence, and the prosecution had the burden, and the jury was to disregard any questions by the prosecutor suggesting or asking where a witness was or if someone was going to testify for the defense.

The prosecutor then asked Arellano again about statements he was making for the first time at trial that he did not make in police interviews.

Although defendants did not object at the time of this testimony, they raised Doyle during a recess. The trial court initially indicated it would be willing to give a jury instruction if the parties fashioned an appropriate one, but the defense's proposed instruction went too far, because Arellano did give interviews to the police, and "it is fair game for the People to say when you talked to the police, you never said anything about that, that's fair game." Arellano's counsel agreed.

The trial court ultimately concluded there was no Doyle problem (hence no need for instruction), because Arellano waived his right to remain silent and gave two interviews to the police, and it was fair for the prosecutor to bring out that Arellano did not say in his police interviews things he was saying on the witness stand. Also, the prosecutor agreed not to argue to the jury Arellano's silence after he invoked his right to remain silent.

Assuming error, it was harmless beyond a reasonable doubt. Arellano did speak with the police on two or three occasions, and his attorney admitted it was appropriate for the prosecutor to probe omissions from those statements. The prosecutor did not ask the jury to use Arellano's silence after he invoked his right to remain silent.

/////

50

(Opinion at *48-49.)

Petitioner "recognizes the prosecutor's right to cross-examine him about his early police interviews." (Pet. at 78.) However, he complains that the prosecutor violated the rule established in <u>Doyle</u> by improperly questioning him about a subject that he chose not to speak about during the three years after his last police interview. (<u>Id.</u> at 78-79.) Petitioner explains: "the cross-examination here inexorably impeached petitioner with his silence about Zarete and Betancourt in the three years after his interviews: he never told anyone how he met Betancourt **since** the interviews." (emphasis in original.) (<u>Id.</u> at 79.) Petitioner concedes that the prosecutor did not explicitly comment on his silence, but he argues that "he did not need to: the damage was already done during cross-examination." (<u>Id.</u>) Petitioner claims that the trial court's "rulings declining instruction to combat the <u>Doyle</u> error in cross-examination, and denying the motion for new trial, were error." (<u>Id.</u> at 78.)

Petitioner notes that the trial judge originally stated he thought the jurors should receive an instruction clarifying how they should evaluate petitioner's answers on cross-examination in light of the decision in <u>Doyle,</u> but then failed to give one. Petitioner states that a "big part" of his defense to the prosecution's conspiracy theory was that he did not meet Betancourt until after Halloween. (<u>Id.</u> at 79.) He contends that impeachment with his post-arrest silence "should never have gone unchecked." (<u>Id.</u> at 80.)

Respondent counters by arguing that the prosecutor was not commenting on petitioner's silence but was simply pointing out that petitioner had failed to tell the police about meeting Bentancourt for the first time at Zarate's house after Halloween during the two police interviews at which he had waived his right to remain silent. (Answer at 51.) Respondent argues that the prosecutor properly cross-examined petitioner on the inconsistencies between his past statements to police and his trial testimony. (<u>Id.</u>) Respondent also argues that, in any event, there was no prejudice to petitioner from any <u>Doyle</u> error because the prosecutor made it clear to

/////

51

the jury that he was referring to petitioner's prior statements to police and not his later invocation

of his right to remain silent.  (Id. at 52.)

The United States Supreme Court has held that the introduction of a defendant's

post-arrest silence for impeachment purposes violates due process in cases in which the

defendant may have relied on his Miranda warnings in remaining silent.  Doyle v. Ohio 426 U.S.

610, 618 (1976).  The court in Doyle reasoned that it would be fundamentally unfair to apprise a

defendant that he has the constitutional right to remain silent and then use that silence against

him at trial.  Id.; see also United States v. Negrete-Gonzales, 966 F.2d 1277, 1280-81 (9th Cir.

1992) (finding Doyle error when petitioner was questioned about his "post-Miranda silence").

The essence of the holding in Doyle is that the Due Process Clause bars "the use for

impeachment purposes" of a defendant's post-arrest silence.  426 U.S. at 619 n.8.

However, Doyle does not apply to cross-examination regarding a defendant's

prior statements to police that are inconsistent with his trial testimony.  See Anderson v. Charles,

447 U.S. 404, 408 (1980) ("The questions were not designed to draw meaning from silence, but

to elicit an explanation for a prior inconsistent statement."); Hurd v. Terhune, 619 F.3d 1080,

1087 ("Anderson applies in cases where a defendant waives his Miranda rights and answers an

officer's questions only to offer conflicting testimony at trial.")  Thus, under such circumstances

"the prosecutor may point out inconsistencies."  Leavitt v. Arave, 383 F.3d 809, 827 (9th Cir.

2004).

> When the defendant offers testimony at trial that differs from his
> post-arrest statement, he raises a question of credibility.  The jury
> must determine whether to believe the version of events to which
> the defendant testifies at trial or the version he revealed to the
> police when arrested.  In such a situation, the jury is entitled to all
> the relevant evidence bearing on credibility.  The prosecutor, to
> provide this evidence, may probe all post- arrest statements and the
> surrounding circumstances under which they were made, including
> defendant's failure to provide critical details.

United States v. Ochoa-Sanchez, 676 F.2d 1283, 1286 (9th Cir. 1982).  "A defendant's post-

arrest statements need only be arguably inconsistent with the defendant's trial testimony in order

1    to justify comment by the prosecution upon the discrepancy." <u>United States v. Diaz</u>, 961 F.2d

2    1417, 1419 (9th Cir. 1992).

3            Here, the prosecutor cross-examined petitioner about his trial testimony regarding

4    Betancourt, as follows:

5
6
7

       Q.  (by the prosecutor)  Well, let's talk about, according to your testimony yesterday, when you first met Richard Betancourt.  And I believe in your testimony yesterday – by the way, that's the first time ever since you've been arrested you've ever mentioned that you didn't meet Richard Betancourt until after Halloween.  Correct?

8
9

       A.  I don't remember.

10

       Q.  Well, you never said it when you were interviewed in November of '02.  Correct?  You never talked about Richard and said I didn't know him before Halloween.  Right?

11
12

       A.  I might have said it.  I don't remember.

13

       Q.  Well, if I told you the tape is in evidence and you never mentioned Richard Betancourt, not knowing him before Halloween.  Is that fair?

14
15

       A.  Yes, sir.

16

       Q.  You never mentioned it in '03, and you were interviewed again.  Right?

17

       A.  Yes, sir.

18
19

       Q.  So the first time you mention it is when you took the stand on Tuesday and told this jury that you had never associated with or contacted Richard Betancourt prior to Halloween.  Fair?

20

       Q.  Can you run that by me again, please.

21
22
23

       Q.  The first time you've ever – well, when you took the stand on Tuesday and testified to the jury, that was the first time you'd ever said to anybody in law enforcement or this Court that you did not know Richard Betancourt prior to Halloween of '02.  Correct?

24

       A.  I might have.  I might have told the officers.  I don't remember.

25

       Q.  Wouldn't that have been reflected in the tapes that the jury has?

       A.  Yes.

26    /////

1      Q.  And if it is not, maybe you're recalling wrong.  Fair?

2      A.  I said – yes, sir.

3      Q.  Well, you testified yesterday or Tuesday that you met Richard Betancourt after Halloween.  Right?

4

      A.  Yes, sir.

5

6  (RT at 12757-59.)

7      Q.  Before today, or actually Tuesday, you had never told this to law enforcement before during those interviews, have you?

8

      A.  What was that?

9

      Q.  November of '02 there was another interview shortly after that
10  with officer Ramos in '02 and another interview in '03, and you never talked about this scenario where you go over to Bobo's after
11  Halloween, did you?

12      A.  Yes, I did.

13      Q. You did talk about it?

14      A. Yes, I did.

15      Q.  When do you remember talking about that for the first time?

16      A.  I am not sure if it was in the first statement.

17      Q.  Well, tape's in evidence.

18      A.  Yes, sir.

19      Q.  And your recollection you said that during the first interview?

20      A.  I'm not sure if it was in the first one.

21      Q.  So your testimony, if I understand you, is you get together with some guys you barely knew, Nate Easlon, Richard Betancourt,
22  Bobo and Jennifer, smoke dope in your apartment, without Bobo to start, and then went over to Bobo's and smoked some more dope at
23  2:00 in the morning the same evening?

24      A.  Yes, sir.

25      Q.  And Oscar was there?

26      A.  Yes, sir.

Q.  And this was really the first time you really sat down with these guys and had any significant interaction?

A.  Yes, sir.

Q.  And the fact that Nate Easlon and Richard Betancourt have testified against you in the matter and have said that meeting took place before Halloween, how do you explain that, Mr. Arellano?

A.  Like I say, they're lying.

(Id. at 12780-81.)

It is clear from this exchange that both petitioner and the prosecutor were addressing the question of whether petitioner's testimony at trial about when he met Betancourt conflicted with his prior statements to the police during the first two interviews at which petitioner had waived his right to remain silent.  Pursuant to the authorities discussed above, the prosecutor was entitled to explore this discrepancy without violating the holding of Doyle. Moreover, the prosecutor did not comment on petitioner's silence following his two police interviews during his closing argument to the jury, nor did he rely upon petitioner's refusal to talk to the police at his last police interview as evidence of petitioner's guilt.  Because the prosecutor did not commit Doyle error, the trial court did not err in failing to give a jury instruction with respect to this issue or in refusing to grant petitioner a new trial on the basis of Doyle error.

Finally, even if it were to be concluded that Doyle error occurred at petitioner's trial, it was harmless.  The prosecutor's cross-examination of petitioner on the subject of when he met Betancourt comprised only several pages of the 15,000 page trial transcript and the case against petitioner was substantial.  See Brecht, 507 U.S. at 621 ("It is clear that the Doyle error at Brecht's trial did not 'substantially influence' the jury's verdict within the meaning of Kotteakos, since the record, considered as a whole, demonstrates that the State's references to Brecht's post-Miranda silence were infrequent and were, in effect, merely cumulative of the extensive and permissible references to his pre- Miranda silence; that the evidence of his guilt was, if not

55

1  overwhelming, certainly weighty; and that circumstantial evidence also pointed to his guilt.");

2  Cook v. Schriro, 538 F.3d 1000, 1019-1023 (9th Cir. 2008).  Under these circumstances, the state

3  court's conclusion that any Doyle error was harmless is not objectively unreasonable.

4  Accordingly, petitioner is not entitled to federal habeas relief on this claim.

5       H.  Admission of Testimony of Jailhouse Informant (Massiah Violation)

6            In his next ground for relief, petitioner claims that the trial court's admission into

7  evidence of the testimony of jailhouse informant Richard Bowie violated his federal

8  constitutional rights as set forth in Massiah v. United States, 377 U.S. 201 (1964), because

9  Bowie was a government agent who deliberately elicited incriminating information against

10 petitioner and Cervantes.  (Pet. at 80.)  Petitioner also argues that the erroneous admission of this

11 testimony was prejudicial to him.  (Id. at 82.)  Petitioner explains:

12            Suspect as his testimony was, Bowie testified to important
             admissions from Cervantes indicating he was the shooter, and to
13           other admissions and consciousness of guilt evidence regarding the
             other defendants, including petitioner.  Even if Bowie had the same
14           degree of desperation and knowledge about the prosecution as the
             turncoat accomplices, jurors could view his testimony as
15           corroboration independent of accomplice testimony.  Anything
             adding corroboration independent of suspected charged accomplice
16           testimony could be significant in bolstering a shaky case here.

17 (Id.)

18           The trial court held a hearing on petitioner's motion to exclude Bowie's

19 testimony.  (RT at 6355-69.)  The trial judge denied the motion after hearing the arguments of

20 counsel.  The trial judge explained his reasoning as follows:

21           Well, during the break I went back and reread the various cases
             that I've copied.  I do have Williams[19] and I do have Randolf.[20]
22           I've got several of them.  And the court is very sensitive to the
             Court's comments regarding the Massiah and the violations that a
23           defendant in jail may be stupid enough to say things that another
             inmate wants to disclose that.  But that's just life.  But the state

24

25       [19]  People v. Williams, 16 Cal.4th 153 (1997).

26       [20]  Randolph v. Hamlet, 380 F.3d 1133, 1144-45 (9th Cir. 2004).

should have no hand in it.  They shouldn't be a party to it.  They shouldn't encourage it.  They shouldn't send him into, in essence, a state agent.

I think that's – I don't have any quarrels with that ruling at all.  It's too easy.  As one of these cases – I'm not sure if it was <u>Randolf</u> – yes, I think it was <u>Randolf</u>, where they made the statement that he was – the snitch was ostensibly no more than a fellow inmate.  But that does not mean somebody is silly enough to make a statement to somebody that they can't pass it on in the hopes of getting a deal.

So long as the state doesn't solicit it, does not ask for it, does not participate in it, doesn't make any deals.  And the Court specifically finds there was no offers made by both Scoggins – or Gill and Bowie both said, you know, no offers were made.  No deals were made.

Even Price in his testimony, in my notes, wrote that he wanted to pass information on to the DA's office and Price said talk to your attorney.  I mean, I just don't see any state action, state involvement and you can't stop a man from talking to somebody if he wants to do that.

I just make a specific finding that no deals were offered or contemplated.  In fact, Sergeant Gill several times repeated there's no promise, no deals, doing this on your own.  There's no evidence that the Court has received that anyone, Gill, Price, or anyone else, did anything in response to affirmatively encourage or solicit any action.  He wanted to talk to them and they sat down and let him talk.  I don't have any doubts, as counsel pointed out, Mr. Bowie's got a less than stellar record.  It's rather pathetic.

But the flip side of that is he's probably pretty – as a matter of fact, pretty smart.  He would be called – he's an experienced crook.  And probably knew from his experience, if I get some information, I can get out of here.  But that didn't involve the People.

The Court finds that Mr. Bowie took initiative that he actively tried to get information to get a deal.  The Court does find that the witnesses were credible and especially – not especially, but Mr. Bowie's testimony was consistent with Sergeant Gill and Price.

I didn't see any inconsistencies.  So Mr. Bowie specifically said he had information prior to the first meeting.  He already had the jail duty that he was in.  He wasn't given that duty to put him in an opportunity, which is what one of the cases talks about.  That was not done to facilitate what he was doing.  He sought the state out.  The state repeatedly said there's no promise, no deals, quote, you're doing this on your own, closed quote.

/////

The Court finds that the state gave Mr. Bowie no impressions, quote/unquote, that he was going to get a better deal. In fact, he got a worse deal. What happened has happened since all this has gone down. That's conjecture. I have no idea. There's no evidence one way or another.

The Court finds that there was – the state had less involvement in this case than it did in <u>Williams</u> case. The state didn't intercede. They didn't ask. They didn't request. They didn't direct him to get information. They didn't make any promises or any rewards. The police didn't return him to the same position as they did in <u>Randolf</u>.

I'm very sensitive to the issues because I think they're significant. But in this case the Court just does not feel that Mr. Bowie was a state agent. He was not acting under instructions from the government. He wasn't paid. He wasn't placed there to create an opportunity.

And as they said in <u>Williams</u>, if anything could be worked out, it was not up to Jacobs but to his supervisor. They're implying there was something. But here there was nothing here. No deals, no promises. You're doing this on your own.

So specifically the Court finds he was not acting as a government agent pursuant to any pre-existing arrangement with the expectation of some result benefitting him or an advantage and that deliberately he elicited incriminating statements. He was just being a facilitator. They are given kites to pass around because of the position he had. So the Court is going to deny the motion.

(<u>Id.</u> at 6366-69.)

The California Court of Appeal also rejected petitioner's argument that the introduction into evidence of Bowie's testimony at trial constituted a <u>Massiah</u> violation. In so concluding, the state appellate court reasoned as follows:

**B. Jailhouse Informant**

Cervantes and Arellano contend the trial court erred in denying their motion to exclude testimony from jailhouse informant Richard Bowie. We disagree.

**1. Background**

Arellano moved in limine to exclude Bowie's testimony, based on <u>Massiah v. United States</u> (1964) 377 U.S. 201, 206 [12 L.Ed.2d 246], which held that statements deliberately elicited from charged

defendants by a jailhouse informant acting as a police agent violate the Sixth Amendment right to counsel and are inadmissible.  The trial court heard testimony from Bowie (who was in jail on charges of attempted escape with two strikes), jail employees, and police officers, that Bowie initiated the contact with law enforcement, said he may have some information about the murders, asked if he could receive some consideration in his own pending case, and was told no – no promises or consideration could be made, and if he came upon information he was acting of his own accord.  A month later, Bowie again initiated contact and turned over his handwritten notes regarding his contacts with defendants.  The officers took the information and repeated there were no promises or consideration, and they were not asking Bowie to seek out information.  Bowie had not previously acted as a police informant.

Bowie ultimately obtained a plea agreement for his truthful testimony in this case.

The trial court found there was no Massiah violation; no deals were offered or contemplated; the jail duty which placed Bowie in contact with defendants was already his assigned duty and was not arranged to facilitate his acting as informant; and whatever hope Bowie had of making a deal was not encouraged by law enforcement.  The trial court accordingly denied the motion to exclude Bowie" testimony.

Bowie testified at trial that he asked Cervantes how he could kill somebody in cold blood, and Cervantes said, "Once a shot's called, it's called."  Bowie said Cervantes said he got rid of the gun by tossing it in the river.  In jail, Bowie transported messages between Cervantes, Olague and Arellano.

**2. Analysis**

In order to prevail on a Massiah claim, the defendant must demonstrate that the informant (1) acted as a government agent, i.e., under the direction of the government pursuant to a preexisting arrangement, with the expectation of a benefit or advantage, and (2) deliberately elicited incriminating statements.  (In re Neeley (1993) 6 Cal.4th 901, 915.)  It is not the government's intent or overt acts that are dispositive; rather, it is the likely result of the government's acts.   (United States v. Henry (1980) 447 U.S. 264, 271 [65 L.Ed.2d 115].)

Here, Bowie elicited incriminating remarks, but there was no preexisting arrangement, no government direction, and no government act from which Bowie could reasonably expect a benefit.

Defendants claim this was a case of transparent plausible deniability, "a wink and a nod" between government and

1    informant.  They cite <u>Randolph v. California</u> (9th Cir. 2004) 380
2    F.3d 1133, which held a jailhouse informant was acting on behalf
     of the State, where there was sufficient undisputed evidence that
3    the State "made a conscious decision to obtain [the informant's]
     cooperation." (<u>Id.</u> at p. 1144.)  The Ninth Circuit remanded to the
4    trial court for further factfinding as to whether there was a <u>Massiah</u>
     violation.  (<u>Id.</u> at p. 1147.)  Here, defendants fail to cite any
5    undisputed evidence of a conscious decision by the government to
     obtain Bowie's cooperation.  Thus, <u>Randolph</u> is distinguishable,
6    and we need not address the People's argument that it conflicts
     with California authority.

7    Admission of Bowie's testimony does not afford grounds for
8    reversal.

9    (Opinion at *21-22.)

10          The United States Supreme Court has held that a criminal defendant's right to

11   counsel is violated when a state agent deliberately elicits an incriminating statement outside the

12   presence of the defendant's counsel.  <u>Massiah</u>, 377 U.S. at 206; <u>see also</u> <u>Fairbank v. Ayers</u>, 650

13   F.3d 1243, 1255 (9th Cir. 2011).  To establish a <u>Massiah</u> violation, a defendant must demonstrate

14   both that the informant was acting as a government agent and that the informant deliberately

15   elicited incriminating statements.  <u>United States v. Henry</u>, 447 U.S. 264, 270 (1980); <u>Fairbank</u>,

16   650 F.3d at 1255.  To determine whether a government agent deliberately elicited incriminating

17   statements, a reviewing court should consider: (1) whether the inmate is "acting under

18   instructions as a paid informant for the Government;" (2) whether the informant is "ostensibly no

19   more than a fellow inmate" of the petitioner; and (3) whether the informant was in custody and

20   under indictment" at the time he obtained the incriminating information.  <u>Henry</u>, 447 U.S. at 270.

21   The Ninth Circuit Court of Appeals has held that an explicit agreement to compensate the

22   informant, while relevant, is not necessary to a finding that the informant acted as an agent of the

23   state.  <u>Randolph v. People of the State of Cal.</u>, 380 F.3d 1133, 1144 (9th Cir. 2004).  "[I]t is the

24   relationship between the informant and the State, not the compensation the informant receives,

25   that is the central and determinative issue." <u>Id.</u>  Moreover, "[a] federal habeas court ruling on a

26   /////

60

1    <u>Massiah</u> claim must also give the state court opinion the deference required by AEDPA."

2    <u>Fairbank</u>, 650 F.3d at 1255-56 (quoting <u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 459–61 (1986)).

3    Here, the state court concluded that Bowie was not a paid informant for the

4    prosecution and that the state had no involvement in his decision to obtain information against

5    petitioner and Cervantes.   These factual findings are presumed to be correct unless petitioner

6    rebuts that presumption by clear and convincing evidence.   28 U.S.C. § 2254(e)(1).   Petitioner

7    attempts to do so by pointing to evidence introduced at his trial that:

8         Bowie contacted police through his wife to tell them he had or may
     have information regarding this case; no promises were made, but
9         Bowie was seeking a deal, he said he was already in contact with
     the defendant's and had access to kites, he had told guards he
10        already had information, and police told him it was up to him
     whether to pass on information but you 'may get nothing;' his wife
11        contacted police again soon thereafter; police then received notes
     from Bowie; later, on their own, police followed up repeatedly.
12        According to jail report, Bowie early on (before he provided notes)
     was already telling guards he was working a deal with the DA to
13        provide information in a high profile case; he was going to give
     full cooperation over the next few months.

14

15   (Pet. at 81.)   Even assuming arguendo that petitioner's recitation of facts is true, he has not

16   established that Bowie was a police informant.   There is no evidence before this court that the

17   prosecution deliberately elicited statements from Bowie incriminating petitioner or that Bowie

18   was acting under instruction from the prosecutors in petitioner's case.   On the contrary, it is

19   undisputed that Bowie contacted prosecutors himself and was told throughout his discussions

20   with the authorities that he could not expect a benefit from any evidence he might come forward

21   with.   Because petitioner has failed to make the required showing, the decision of the California

22   Court of Appeal that the admission into evidence of Bowie's testimony did not violate the

23   dictates of <u>Massiah</u> is not contrary to or an unreasonable application of clearly established federal

24   law.   Accordingly, petitioner is not entitled to federal habeas relief with respect to his claim that a

25   <u>Massiah</u> violation occurred.

26   /////

I.   Videotape of Petitioner's Participation in Prison Assault

In his next ground for relief, petitioner claims that the trial court violated state law and his federal right to due process when it admitted into evidence a videotape of petitioner's participation in a prison assault that occurred "almost a year after the offenses." (Id. at 82.) Petitioner argues that the challenged evidence was "unduly prejudicial and irrelevant" and that it "reduced the People's burden of proof and created a substantial risk that petitioner was convicted on the basis of other inflammatory and irrelevant misconduct and violent character, rather than the evidence of the charged offenses." (Id.) Petitioner states that "the fact he was a short-termer Norteno caught up in an order to retaliate against Surenos does nothing to prove he is a shot caller, especially outside on the street months earlier." (Id. at 83.) Petitioner argues that "the tape is the straw that broke the camel's back in a trial [in] which the deck was already heavily stacked against petitioner." (Id. at 84.)

The California Court of Appeal rejected these arguments on appeal, reasoning as follows:

**F. Admission of Videotape Re Arellano**

Arellano complains of admission of a videotape of him participating in a prison riot while incarcerated for a parole violation, almost a year after the Halloween offenses. We see no basis for reversal.

Evidence Code section 1101 says character evidence is generally inadmissible to prove conduct on a specific occasion, but the statute also says it does not prohibit such evidence to impeach a witness or to show matters such as intent, preparation, plan, etc. The analysis turns on (1) the materiality of the fact sought to be proved; (2) the tendency of the uncharged act to prove that fact; and (3) the existence of any rule or policy requiring exclusion, such as Evidence Code section 352, which gives the court discretion to exclude evidence that is more prejudicial than probative. (People v. Thompson (1980) 27 Cal.3d 303, 315.)

On the witness stand, Arellano admitted he was a Norteño gang member and drug dealer, had been to prison as a gang member and was convicted of felony spousal abuse, but he denied being a gang "shot caller" (leader).

/////

62

1

2

3

4

      After Arellano denied being a shot caller, the prosecutor asked to admit into evidence a three minute video showing Arellano leading a group of individuals to attack others in a prison yard.   The relevance was to show he was a gang leader, to impeach his testimony, and to go to the issue of his statements at the pre-Halloween meeting that the lax performance in the drug trade should be handled like they handle things in prison.

5

6

7

8

      The court preliminarily ruled to allow the videotape because it was highly probative, and Evidence Code section 352 was insufficient to exclude it, but the court wanted to view the videotape.  After viewing the tape, the court affirmed its ruling, and the video was shown to the jury and used by the prosecution in closing arguments to show Arellano's leadership role in the gang because he led the prison riot.

9

10

11

12

      On the witness stand, Arellano denied that he led the attack.  He said he was just following orders to attack.  On appeal, Arellano says that, during his penalty trial, a former Norteño testified he was supposed to be the first one out in front but got scared at the last minute.   However, this evidence was not before the trial court when it made the ruling to allow the videotape during the guilt phase of trial.

13

14

15

16

17

18

      Arellano argues the videotape showed nothing more than his status as a Norteño and offered nothing more than a visceral shock demonstration of a capacity for violence.  We disagree.  There was conflicting evidence on the question whether Arellano was a gang leader who had a leadership role in the plan to get Stepper. Arellano said no, the expert opined yes.  The videotape was probative of this question.  On appeal, both sides argue the video could cut both ways, i.e., a shot caller might be expected to operate behind the scene and let a midlevel soldier lead the actual combat. However, this is a subject for argument to the jury; it does not warrant exclusion of the evidence.

19

      The videotape was properly admitted.

20

(Opinion at *29-30.)

21

      As explained above, under AEDPA, "even clearly erroneous admissions of

22

evidence that render a trial fundamentally unfair may not permit the grant of federal habeas

23

corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme

24

Court." Holley, 568 F.3d at 1101.  Under this test, the state court's rejection of petitioner's due

25

process claim here does not support habeas relief under AEDPA because the admission of a

26

/////

videotape of a gang-related prison assault to show that petitioner had a leadership position in a street gang did not violate any clearly established federal law.  Id.

In any event, petitioner has failed to show that the admission of the videotape into evidence violated his right to a fair trial.  As set forth above, admitted evidence violates due process only if "there are no permissible inferences the jury may draw from the evidence." Jammal, 926 F.2d at 920.  See also Gonzalez v. Knowles, 515 F.3d 1006, 1011 (9th Cir. 2008); Windham v. Merkle, 163 F.3d 1092, 1103 (9th Cir. 1998).  In this case, the challenged videotape was relevant to show that petitioner had achieved a level of authority within his street gang, as evidenced by his roll and participation in the prison riot and assault, and that this authority would have enabled him to orchestrate the killings with which he was charged.  Because this is one permissible inference the jury could draw from the challenged videotape evidence, its admission did not violate petitioner's right to due process.  Accordingly, petitioner is not entitled to relief on this claim.

J.   Jury Instruction Error

Petitioner raises several claims of jury instruction error.  After setting forth the governing legal principles, the court will evaluate these claims in turn below.

1.  Legal Principles

In general, a challenge to jury instructions does not state a federal constitutional claim.  Engle v. Isaac, 456 U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due process right guaranteed by the fourteenth amendment." Cupp v. Naughten, 414 U.S. 141, 146 (1973).  See also Hendricks v. Vasquez, 974 F.2d 1099, 1106-07 (9th Cir. 1992).  To prevail on such a claim petitioner must demonstrate that an erroneous instruction, "'"by itself so infected the entire trial that the resulting conviction violates due process."'" Estelle, 502 U.S. at 72-73 (quoting Cupp, 414 U.S. at 147.)  See also Chambers v. McDaniel, 549 F.3d 1191, 1199 (9th Cir.

2008).  The United States Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly.'" Dowling v. United States, 493 U.S. 342, 352 (1990).

When considering an allegedly erroneous jury instruction in a habeas proceeding, an appellate court first considers whether the error in the challenged instruction, if any, amounted to "constitutional error." Calderon v. Coleman, 525 U.S. 141, 146 (1998).  The test for "constitutional error" was described by the Supreme Court in Boyde v. California, 494 U.S. 370, 380 (1990).  Specifically, a reviewing court asks "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Id.  In evaluating this question, the following questions are relevant:  (1) whether there is a reasonable likelihood that the jury understood an allegedly ambiguous instruction to mean what the defendant suggests it means; and (2) if so, "whether the instruction, so understood, was unconstitutional as applied to the defendant." Coleman, 525 U.S. at 147.  The court must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a component of the entire trial process.'" Id. (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)).

If the court finds constitutional error, it must apply the test for harmless error to determine whether the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S. at 637 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  See also California v. Roy, 519 U.S. 2, 4-6 (1996); Polk v. Sandoval, 503 F.3d 903, 911 (9th Cir. 2007); Beardslee v. Woodford, 358 F.3d 560, 578 (9th Cir. 2004).  If a reviewing court is "in grave doubt as to whether the error had such an effect, the petitioner is entitled to the writ." Polk, 503 F.3d at 911 (quoting Coleman v. Calderon, 210 F.3d 1047, 1051 (9th Cir. 2000)).

2.  CALJIC No. 2.50

Petitioner claims that the trial court violated his right to due process by instruction his jury with CALJIC No. 2.50, an instruction regarding consideration of other crimes evidence.

65

(Pet. at 85.)  He argues that this instruction reduced the prosecution's burden of proof on "key

ultimate issues" and created a risk that he would be convicted on the basis of "irrelevant and

inflammatory evidence" rather than on evidence of the charged crime.  (Id. at 86.)  Petitioner

further argues that the error in instructing the jury with CALJIC No. 2.50 violated his right to

confront the witnesses against him by allowing jurors to consider improper testimony given by

the gang expert "for substantive purposes on all substantive issues."  (Id.)  He argues that

CALJIC No. 2.50 grossly overstated the purposes for which gang evidence and other crimes

evidence could properly be considered by the jury, and failed to appropriately limit the reach of

the instruction.  (Id.)  Petitioner concedes that the trial court gave a limiting instruction (CALJIC

No. 17.24.3), but argues that this limited instruction conflicted with the more broadly stated

CALJIC No. 2.50, which allowed the jury to consider all gang and other crimes evidence for

purposes for which it was not admissible.  (Id.)  Petitioner also argues that, given the use of this

instruction, the jury may have found him guilty of the charged crimes based on irrelevant hearsay

or "prejudicial matters."  (Id.)  Finally, petitioner contends that if additional instructions should

have been given on this subject or if objections should have been made to the giving of CALJIC

No. 2.50, his trial counsel rendered ineffective assistance in failing to take the appropriate

actions.  (Id. at 88-89.)

> The California Court of Appeal rejected these arguments, reasoning as follows:
>
> In reviewing challenges to jury instructions as incorrect or incomplete, we do not view jury instructions in isolation but consider them in the context of the overall charge to the jury. (People v. Rundle (2008) 43 Cal.4th 76, 149.)  The test for ambiguity in instructions is whether there is a reasonable likelihood the jury misunderstood and misapplied the instruction. (Ibid.)

/////

/////

/////

/////

**A. CALJIC No. 2.50**

Arellano contends the trial court erred in giving, unedited, CALJIC No. 2.50 [21] (other crimes evidence), that permitted the jurors to consider other crimes and all gang evidence on all conceivable issues in the case. We see no basis for reversal.

Defense counsel initially asked the trial court to delete references applicable to prior similar crimes (intent, identity, motive, etc.), because there were no prior similar crimes in this case. The issue was deferred. Arellano says CALJIC No. 2.50 apparently was used to cover gang enhancement predicates, and perhaps gang membership on issues like motive. He complains the instruction permitted the jurors to consider all gang evidence and all other crimes evidence on every conceivable issue in the case.

However, as Arellano acknowledges, the prosecutor did not explicitly argue prior similar acts. Moreover, the instruction on its face limited the jury's consideration of the other crimes evidence. Additionally, the trial court gave a limiting instruction, pursuant to CALJIC No. 17.24.3, that evidence of gang activities, other than the charged offenses, "may be considered by you only for the limited purpose of determining if it tends to show that the crime or crimes charged were committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent [etc.] For the limited purpose for which you may consider this evidence, you must weigh it in the same manner as you do all other evidence in the case. [¶] You are not permitted to consider such evidence for any other purpose."

---

[21] CALJIC No. 2.50 said in part, "Evidence has been introduced for the purpose of showing that a defendant committed crimes other than that for which he is on trial, and in addition, evidence has been introduced for the purpose of showing criminal street gang activities, and of criminal acts by gang members, other than the crimes for which the defendants are on trial. [¶] Except as you will otherwise be instructed, this evidence, if believed, may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes. It may be considered by you only for the limited purpose of determining if it tends to show: [¶] A characteristic method, plan or scheme in the commission of criminal acts similar to the method, plan or scheme used in the commission of the offense in this case which would further tend to show the existence of the intent which is a necessary element of the crime charged or the identity of the person who committed the crime, if any, of which a defendant is accused or a clear connection between the other offense and the one of which the defendant is accused so that it may be inferred that if a defendant committed the other offenses, that defendant also committed the crimes charged in this case; [¶] [ Intent, identity, motive, knowledge, conspiracy.] [¶] That the . . . crimes charged were committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members. [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as [other evidence]. [¶] You are not permitted to consider such evidence for any other purpose."

1    Arellano argues CALJIC No. 17.24.3 "apparent[ly]" conflicted
     with CALJIC No. 2.50, because the latter allowed the jurors to
2    consider gang evidence and other crimes evidence on every
     conceivable issue in the case.  However, CALJIC No. 2.50,
3    footnote 13, ante, specified, "Except as you will otherwise be
     instructed . . . ."
4
     Arellano also argues the trial court failed to instruct with CALJIC
5    No. 2.50.2, the definition of preponderance of evidence.  The
     People respond the trial court did give that instruction
6    (immediately after an instruction concerning admissibility of
     coconspirators' statements).  Arellano replies nothing told the
7    jurors this standard applied to CALJIC No. 2.50.  However,
     Arellano fails to show how he was prejudiced.  CALJIC No. 2.50
8    told the jurors how to use evidence of other crimes, "if believed."
     Preponderance is the easiest standard to meet.  Thus, any omission
9    was harmless (individually and considered cumulatively with other
     errors).
10
     We see no basis for reversal regarding CALJIC No. 2.50.
11

12   (Opinion at *41-42.)

13          The decision of the California Court of Appeal that the giving of CALJIC No.

14   2.50 in this case did not violated petitioner's constitutional rights is not contrary to or an

15   unreasonable application of federal law and should not be set aside.  As the state appellate court

16   pointed out, the language of CALJIC No. 2.50 itself limited the jury's consideration of other

17   crimes evidence, and the jury was given an additional instruction that further explained how

18   evidence of other gang activities was to be considered by them.  The jurors are presumed to have

19   followed these instructions.  Penry v. Johnson, 532 U.S. 782, 799 (2001).  Moreover, as noted by

20   the state appellate court, the prosecutor did not argue that petitioner's commission of other

21   similar acts tended to show that he committed the crimes for which he was on trial.  See Hayes v.

22   Woodford, 301 F.3d 1054, 1087 (9th Cir. 2002) ("While counsels' closing arguments could not

23   overcome a patently deficient instruction, the arguments may eradicate ambiguity in an

24   instruction."), rev'd on other grounds en banc Hayes v. Brown, 399 F.3d 972 (9th Cir. 2005).

25   Under these circumstances, there is no "reasonable likelihood" that petitioner's jury applied

26   CALJIC No. 2.50 so broadly as to lower the prosecutor's burden of proof.  Sarausad, 555 U.S. at

190.  Viewing the instructions as a whole, this court concludes that the giving of CALJIC No.

2.50 did not rendered petitioner's trial fundamentally unfair.  See Estelle, 502 U.S. at 73

(upholding a variant of CALJIC No. 2.50 against a due process challenge); see also Schultz v.

Tilton, 659 F.3d 941, 943-45 (9th Cir. 2011).  Accordingly, petitioner is not entitled to federal

habeas relief on his challenge to the giving of CALJIC No. 2.50.

> 3.  Jury Instruction on Accomplice Liability and the Natural and Probable
>     Consequences Doctrine

In his next ground for federal habeas relief, petitioner claims that the jury

instructions given at his trial on accomplice liability and the natural and probable consequences

doctrine violated his rights to due process, a fair trial, and the right to a jury determination on all

issues.  (Pet. at 89.)  Petitioner's specific claims, and the state court's resolution of those claims,

were explained by the California Court of Appeal, as follows:

**B. Instruction-Accomplices**

Arellano and Olague raise several complaints about the jury
instructions on aiding/abetting versus conspiracy and
natural/probable consequences.  We see no grounds for reversal.

First, Arellano argues the court failed to instruct the jurors that,
under the natural and probable consequences doctrine, an
aider/abettor may be convicted of a lesser offense than the
perpetrator.  We have said, "an aider and abettor may be found
guilty of crimes committed by the perpetrator which are less
serious than the gravest offense the perpetrator commits, i.e., the
aider and abettor and the perpetrator may have differing degrees of
guilt based on the same conduct depending on which of the
perpetrator's criminal acts were reasonably foreseeable under the
circumstances and which were not."  (People v. Woods (1992) 8
Cal. App.4th 1570, 1586-1587, italics omitted [aider/abettor may
be found guilty of second degree murder under natural/probable
consequence doctrine although the principal was convicted of first
degree murder].)  However, this point was adequately conveyed to
the jury in a special instruction which stated:  "If you determine . . .
a defendant aided and abetted a target crime and that the killing
was a natural and probable consequence of the offense, you must
then further determine whether the killing was murder and if so,
what degree?  To find that the murder is first degree, you must
[determine]:  [¶]  1.  The actual killer committed first degree
murder [as defined in other instructions], and  [¶]  2.  The

circumstances which make the murder first degree as to the actual killer were a natural and probable consequence of the commission of the target crime rather than the independent product of the mind of the actual killer.  [¶]  If you have a reasonable doubt whether the offense committed was first degree or second degree murder, you must give that defendant [i.e., the aider/abettor] the benefit of the doubt and find him guilty of second degree murder."

Second, Arellano argues the court failed to instruct the jury how to make the degree determination for murder for purposes of foreseeability under the natural/probable consequences doctrine – specifically in failing to instruct the jurors they must determine whether the circumstances or mental state (which made the perpetrator's action first degree murder) were foreseeable consequences from the standpoint of Arellano's accomplice liability.  This argument is defeated by the language of the instruction quoted in our preceding paragraph.

Third, Arellano complains of the court's refusal to give a jury instruction submitted by the defense to instruct the jurors that the objective foreseeability determination is to be based on a reasonable person in defendant's position and may only consider facts known to defendant.  To the extent Arellano suggests the jury must make findings as to his actual knowledge, his cited authority does not go that far, i.e., CALCRIM (2006) No. 402 does not require findings of actual knowledge; it says, "Under all of the circumstances, a reasonable person in the defendant's position would have known that the [non-target offense] was a natural and probable consequence . . . ."  A defendant's liability is not limited by his own knowledge but, rather, extends to the natural and probable consequences of any criminal act he knowingly aided. (People v. Flores (1992) 7 Cal. App.4th 1350, 1361.)

Moreover, Arellano does not demonstrate any possible prejudice; he does not point to any evidence of any circumstance of which he was unaware.  The court instructed the jury, "In determining whether a consequence is 'natural and probable,' you must apply an objective test, based not on what a defendant actually intended, but on what a person of reasonable and ordinary prudence would have expected likely to occur.  The issue is to be decided in light of all of the circumstances surrounding the incident.  A 'natural' consequence is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened.  'Probable' means likely to happen."  Although the instruction as given did not use CALCRIM's words "in the defendant's position," Arellano fails to show any possible prejudice.  The instruction referred to all surrounding circumstances, and the surrounding circumstances argued by the prosecutor in closing arguments included all the circumstances, including gang culture.  He told the jury that, in determining natural and probable consequences, "you must immerse yourself

into the world of gangs and think what is that natural and probable consequence in the world of gangs.  Not for you and me.  For gangs."

Fourth, Arellano argues the court gave one oblique instruction on the independent product rule for aiders/abettors (that an aider/abettor was not guilty of first degree murder if the premeditation was an independent product of the shooter's mind), yet incongruously refused any instruction (like CALJIC No. 6.15) on the independent product rule under the conspiracy instructions.  Assuming the defense proposed such an instruction, and further assuming it should have been given, we see no possible prejudice.  The "independent product" phrase in the aiding/abetting instruction merely said that, to convict the aider/abettor of first degree murder, the jury must find (1) the actual killer committed first degree murder, and (2) first degree murder was a natural and probable consequence of the target crime, rather than the independent product of the killer's mind.  The conspiracy instructions gave the qualification about natural/probable consequences.   The omission of the words "rather than the independent product" is inconsequential.

Fifth, Arellano maintains CALJIC No. 6.16 misstated conspirator liability by indicating a conspirator is liable for a fellow conspirator's acts that do not further the common plan, as long as they are natural/probable consequences of the common plan.  The court instructed the jury pursuant to CALJIC 6.16: "Where a conspirator commits an act or makes a declaration which is neither in furtherance of the object of the conspiracy nor the natural and probable consequence of an attempt to attain that object, he alone is responsible for and is bound by that act or declaration, and no criminal responsibility therefor attaches to any of his confederates."  The court also instructed the jury, "You must determine whether a defendant is guilty as a member of a conspiracy to commit the originally agreed upon crime or crimes, and, if so, whether the crime alleged was perpetrated by co-conspirators in furtherance of that conspiracy *and* was a natural and probable consequence of the agreed upon criminal objective of that conspiracy."  (CALJIC No. 6.11; italics added.)  The instructions correctly stated the law.  (People v. Prieto (2003) 30 Cal.4th 226, 249-250; People v. Hardy (1992) 2 Cal.4th 86, 188; CALCRIM No. 417.)  Even assuming any confusion in the instructions, Arellano fails to show any possible prejudice.  Under the prosecution's theory, one purpose of the conspiracy was to elevate the community's fear of gangs.  The natural/probable consequence of the shooter shooting eyewitnesses in addition to the main target furthered this object of the conspiracy.

Sixth, Arellano says CALJIC No. 6.11 confusingly referred to the natural/probable consequences of "any crimes" committed by a conspirator, not the natural/probable consequences of the original

object of the conspiracy.  Arellano says CALCRIM 417 corrects this flaw.  However, Arellano distorts the instruction, which told the jury:  "A member of a conspiracy is not only guilty of the particular crime that to his or her knowledge his confederates agreed to and did commit, but is also liable for the natural and probable consequences of any crimes of a co-conspirator to further the object of the conspiracy, even though that crime was not intended as a part of the agreed upon objective and even though he or she was not present at the time of the commission of that crime.  [¶]  You must determine whether a defendant is guilty as a member of a conspiracy to commit the originally agreed upon crime or crimes, and, if so, whether the crime alleged was perpetrated by co-conspirators in furtherance of that conspiracy and was a natural and probable consequence of the agreed upon criminal objective of that conspiracy."  In context, the "any crimes" language refers to a crime that was committed in furtherance of the conspiracy.  Thus, any such crimes were part of the original object of furthering the conspiracy.

Seventh, Arellano complains the court failed to instruct on voluntary and involuntary manslaughter as lesser offenses for both homicide victims, especially Folsom.  However, even assuming error for the sake of argument, it was harmless (individually and cumulatively).  In similar circumstances, People v. Prettyman, supra, 14 Cal.4th 248, said that, where the trial court instructed on second degree murder as a lesser included offense of first degree murder, and the jury convicted the defendant of first degree murder rather than second degree murder, the jury necessarily rejected the possibility that the only natural and probable consequence of the crime she aided/abetted was involuntary manslaughter, and the defendant suffered no prejudice from any possible error in failing to instruct on involuntary manslaughter.  (Id. at p. 276.)  The factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions.  (Ibid.)  Here, the jury rejected second degree murder and found first degree murder and therefore defendants suffered no prejudice.

Under a separate subheading, Arellano argues the differences between the aiding/abetting and conspiracy instructions were incongruous and confusing.  As is apparent from our discussion, we disagree.

On the same subject of accomplice instructions, Olague argues the trial court erred in instructing the jury on natural/probable consequences and in defining, as target offenses, simple assault and assault with force likely to produce great bodily injury.  He argues that, in the gang context, the doctrine of natural and probable consequences usually applies to a situation in which escalating violence between rivals turns a less violent crime into a more violent crime – which did not happen in this case, where the

shooter simply walked up and fired the gun with no resistance from the victims. However, that one context is the "usual application" does not preclude use of the principle in another context. To the extent Olague argues murder was not a natural and probable consequence of a planned assault, clearly the evidence sufficed to instruct the jury on the issue.

Olague cites People v. Cox (2000) 23 Cal.4th 665, for the supposed proposition that a defendant may be convicted of murder based on a target offense of simple assault only when that conduct was "inherently dangerous under the circumstances of its commission ." However, Cox was not an aiding/abetting case. Rather, it dealt with the question whether conviction of involuntary manslaughter based on an unlawful act, not amounting to felony, requires a showing that the predicate misdemeanor was dangerous under the circumstances of its commission. (Id. at p. 667.) In any event, although simple assault was included in the jury instructions in this case, no one argued this was a simple assault, and the evidence showed at a minimum a planned assault with a gun, thus an assault with force likely to produce great bodily injury. Thus, this is not a case, as argued by Olague, where instruction on a legally incorrect theory requires reversal due to the inability to determine whether the jury based its verdict on a proper theory or the legally incorrect theory. (People v. Guiton (1993) 4 Cal.4th 1116, 1129.) The jury was fully equipped to detect that there was no evidence that the planned crime was merely a simple assault.

We see no basis for reversal in the jury instructions on aiding/abetting and conspiracy.

(Opinion at *42-45.)

For the reasons expressed by the California Court of Appeal in its thorough analysis of petitioner's arguments, petitioner has failed to demonstrate that the jury instructions given at his trial on accomplice liability and the natural and probable consequences doctrine violated his federal constitutional rights. Reviewing the instructions as a whole, this court concludes that the jury instructions challenged by petitioner did not render his trial fundamentally unfair or result in prejudice. Nor did any confusion in the instructions, or slight differences between any of the instructions given, violate petitioner's right to equal protection of the laws. (See Pet. at 93-95.)[22] The decision of the California Court of Appeal rejecting petitioner's

_____

[22] As noted, any argument that the instructions violated California law is not cognizable in this federal habeas corpus proceeding. Bradshaw v. Richey, 546 U.S. 74, 76 (2005).

arguments with respect to these jury instruction claims was not contrary to or an unreasonable

application of clearly established federal law.  See Solis v. Garcia, 219 F.3d 922, 927 (9th Cir.

2000); Spivey, 194 F.3d at 977.  Accordingly, petitioner is not entitled to federal habeas relief on

those claims.

### 4.  Failure to Give a Jury Instruction on Unanimity

In petitioner's next ground for relief, he claims that the trial court's refusal to give

a jury instruction on "unanimity for accomplice liability target offenses" violated his rights to due

process and a unanimous jury verdict.  (Pet. at 96.)  The California Court of Appeal rejected

these arguments, reasoning as follows:

> **C. Instruction-Unanimity**
>
> Arellano argues the trial court erred in refusing and failing to
> instruct the jurors that they had to agree unanimously on the
> offense intended (assault versus murder) for purposes of
> aiding/abetting or conspiracy liability.  He argues the failure to
> require unanimity violated his constitutional right to a unanimous
> verdict.  We disagree.
>
> The court instructed the jurors the target crimes were assault,
> assault by means of force likely to produce great bodily injury,
> and/or murder, and they did not need to agree unanimously as to
> which originally contemplated crime a defendant aided/abetted, so
> long as they unanimously agreed the defendant aided/abetted the
> commission of an identified and defined crime and that the crime
> of murder and/or attempted murder was a natural and probable
> consequence of the commission of that target crime.  The court
> instructed the jurors they need not unanimously agree as to which
> originally contemplated crime a defendant conspired to commit, so
> long as they unanimously agreed the defendant conspired to
> commit assault, assault by means of force likely to produce great
> bodily injury, and/or murder.
>
> Arellano acknowledges that People v. Prettyman, supra, 14 Cal.4th
> 248, indicated (though he characterizes it as dictum) that unanimity
> is not required for target offenses under an aiding/abetting theory.
> (Id. at pp. 267-268.)  He nevertheless argues a unanimity
> instruction was needed here, especially under the conspiracy
> theory, because the evidence suggested more than one discrete
> conspiracy.  (People v. Russo (2001) 25 Cal.4th 1124, 1135;
> CALCRIM No. 416 (2006-2007), Bench Notes, p. 205.)

/////

Russo, supra, 25 Cal.4th 1124, held the jury did not need to agree on a specific overt act as long as it unanimously found that some conspirator committed an overt act. (Id. at p. 1128.) Russo said, "The key to deciding whether to give the unanimity instruction lies in considering its purpose. The jury must agree on a 'particular crime' [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed her guilty of another. But unanimity as to exactly how the crime was committed is not required. Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.] In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (Id. at pp. 1134-1135.)

Arellano argues that, "Perhaps conspiracies to commit an armed gang assault versus a murder are not truly distinct in some cases. Here the conspiracies to assault versus kill were indeed distinct in any fair sense of the word." However, Arellano's argument is based on a selective reading of the evidence. He says no one directly reported an order to kill or even use a gun on Stepper (only a request to beat him up), and more than one conspirator was surprised a shooting occurred. However, there was no evidence that any of these defendants, as conspirators, were surprised. Contrary to Arellano's view that gun references were "oblique," there was testimony that, at the gathering to plan the crimes, Arellano told Easlon and Betancourt (who had refused to participate as perpetrators) to leave because Olague was bringing over the gun for Cervantes (who had agreed to do the deed) to check out.

The trial court was not required to give unanimity instructions.

(Opinion at *45-46.)

The California Court of Appeal concluded that, under the facts of this case, the unanimity jury instruction suggested by petitioner was not required under California law. See Solis, 219 F.3d at 928 (""California law does not require that jurors unanimously agree upon the basis for defendant's guilt, when alternate legally valid theories exist, in reaching a unanimous guilty verdict.") The state appellate court's conclusion in this regard is not based on a

75

1   unreasonable determination of the facts of this case.  See 28 U.S.C. § 2254(d).  Further, this court

2   is bound by the state appellate court's construction of California law.  Aponte, 993 F.2d at 707.

3          It is true that due process demands a certain "verdict specificity" and

4   "fundamental fairness."  Schad v. Arizona, 501 U.S. 514, 637 (1991).  However, there is no

5   evidence that this standard was not satisfied here.  The jury did not ask the court any questions

6   during its deliberations nor did it appear confused as to the unanimity requirement.  Further, there

7   is no indication from the record that the prosecution failed to prove each element of the charged

8   crimes beyond a reasonable doubt.  See id. at 631-32.  Absent any indication of confusion or a

9   lack of unanimity, petitioner has failed to show that his trial was rendered fundamentally unfair

10  by the trial court's refusal to instruct the jurors that they had to agree unanimously on the offense

11  intended by the conspiracy.  Further, where, as here, the challenge is to a refusal or failure to give

12  an instruction, the petitioner's burden is "especially heavy," because "[a]n omission, or an

13  incomplete instruction, is less likely to be prejudicial than a misstatement of the law."

14  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  See also Villafuerte v. Stewart, 111 F.3d 616,

15  624 (9th Cir. 1997).  Petitioner has failed to meet this heavy burden.

16         Nor is petitioner entitled to relief on his claim that the trial court's failure to give a

17  unanimity instruction violated his right to a unanimous verdict.  As a state criminal defendant in

18  a noncapital case, petitioner had no federal constitutional right to a unanimous jury verdict.

19  Apodaca v. Oregon, 406 U.S. 404, 410-12 (1972); Schad, 501 U.S. at 635 n.5; see also Johnson

20  v. Louisiana, 406 U.S. 356, 359 (1972) (the Supreme Court "has never held jury unanimity to be

21  a requisite of due process of law.").

22         5.  CALJIC No. 3.16

23         In his next claim for relief, petitioner argues that his rights to due process and a

24  jury determination on all issues were violated by the giving of CALJIC No. 3.16.  (Pet. at 96-98.)

25  The California Court of Appeal described petitioner's arguments in this regard, and its ruling

26  thereon, as follows:

76

**D. CALJIC No. 3.16**

Arellano contends the trial court erred by instructing the jury, "If the crime of Murder and/or Attempted Murder were committed by anyone, Nate Easlon, Richard Betancourt, Gilberto Lopez, and Christina Marten were accomplices as a matter of law and their testimony and/or statements are subject to the rule requiring corroboration." We disagree.

Arellano argues the instruction improperly directed a verdict or reduced the prosecution's burden, because the instruction all but told the jurors that the confessing codefendants were accomplices to a conspiracy, making defendant's guilt a foregone conclusion. We disagree. The instruction was a correct statement of law.

Arellano argues that, even if error was invited (by the defense's participation in drafting the instruction), the instruction suffers a distinct defect not raised in the trial court, i.e., it undermined the defense theory of third party culpability. Arellano argues the instruction needed to clarify that the named persons were accomplices only if the prosecution's theory was true. However, the failure to request modification forfeits the argument. (People v. Spurlock (2003) 114 Cal. App.4th 1122, 1130.) Cervantes says he did not assent to the instruction. However, that is not enough; he had to make an affirmative request for modification in order to preserve the issue.

(Opinion at *46-47.)

Again, any claim that the giving of CALJIC No. 3.16 violated state law is not cognizable in this habeas petition. Estelle, 502 U.S. at 71-72 ("[F]ederal habeas corpus relief does not lie for errors of state law."). Moreover, the conclusion of the California Court of Appeal that the version of CALJIC No. 3.16 given in this case was a correct statement of California law is binding on this court. Aponte, 993 F.2d at 707.

Petitioner has also failed to demonstrate entitlement to relief on his claim that the giving of CALJIC No. 3.16 violated his federal constitutional rights. Petitioner argues that the instruction given essentially directed a verdict against him because it informed the jurors that the participants in the shooting were all his accomplices. However, the jury was not reasonably likely to interpret the instruction in that manner when viewed in the context of the overall charge. See Pulido v. Chrones, 629 F.3d 1007, 1012 (9th Cir. 2010) ("Hence, 'we accept at the outset the

77

well established proposition that a single instruction to a jury may not be judged in artificial

isolation, but must be viewed in the context of the overall charge.'") (quoting Cupp, 414 U.S. at

146-47); see also United States v. Harrison, 34 F.3d 886, 889 (9th Cir. 1994) ("A single

instruction is not viewed in isolation, but in the context of the overall charge.").  CALJIC No.

3.16 was only one instruction in a series of instructions provided to the jury in petitioner's case

addressing their consideration of accomplice testimony.  These instructions informed the jury,

among other things:  that an accomplice "is a person who is subject to prosecution for the

identical offense charged against a defendant on trial by reason of aiding and abetting or being a

member of a criminal conspiracy" (Clerk's Transcript on Appeal (CT) at 2544); that a person

who assents to, aids, or assists in, the commission of a crime without knowledge of the unlawful

purpose of the perpetrator and without the intent or purpose of committing, encouraging or

facilitating the commission of the crime" was not an accomplice (id. at 2548); and that "If the

crime of murder and/or attempted murder were committed by anyone, Nate Easlon, Richard

Betancourt, Gilberto Lopez, and Christina Marten were accomplices as a matter of law and their

testimony and/or statements are subject to the rule requiring corroboration."  (Id. at 2549.)  The

jury was also instructed that it must decide separately whether each defendant was guilty; that

petitioner was presumed innocent; that the prosecution bore the burden of proving petitioner's

guilt beyond a reasonable doubt; and that not all of the instructions were applicable, depending

on what facts the jury determined to be true.  (Id. at 2520, 2553, 2589, 2593.).  These

instructions, when viewed together, simply instructed the jury how to determine who, if anyone,

was an accomplice and how to consider the testimony of one found to be an accomplice.

Nor did CALJIC No. 3.16 relieve the prosecutor of his burden to prove

petitioner's guilt beyond a reasonable doubt.  CALJIC No. 3.16, along with the accompanying

accomplice instructions, was designed to protect petitioner from having the jury rely solely on the

uncorroborated testimony of an accomplice to find him guilty.  (CT at 2545-47, 2550.)  Indeed,

these instructions held the prosecutor to a higher evidentiary burden of proof than that demanded

1   by the federal constitution.  See United States v. Augenblick, 393 U.S. 348, 352 (1969)

2   (Constitution permits verdict that rests solely upon uncorroborated accomplice testimony); Laboa

3   v. Calderon, 224 F.3d 972, 979 (9th Cir. 2000) ("As a state statutory rule, and to the extent that

4   the uncorroborated testimony is not 'incredible or insubstantial on its face,' the rule is not

5   required by the Constitution or federal law."); United States v. Andrews, 455 F.2d 632, 633 (9th

6   Cir. 1972) ("It is well settled in our Circuit that a conviction may properly rest on the

7   uncorroborated testimony of an accomplice, if the testimony is not incredible or unsubstantial on

8   its face."); see also Lankford v. Arave, 468 F.3d 578, 584 (9th Cir. 2006) (""federal law permits

9   bare accomplice testimony . . . .")  No instruction given in this case suggested to the jury that it

10  could use the status of accomplices as a shortcut to find petitioner guilty, nor did the prosecutor

11  argue to the jury that CALJIC No. 3.16 could be employed for that purpose.  In the context of the

12  instructions as a whole, there is no reasonable possibility petitioner's jury would have relied upon

13  CALJIC No. 3.16 as a substitute for proof of petitioner's criminal intent, or that any juror would

14  have understood the instruction as dictating the identity of petitioner's accomplices, thereby

15  directing a verdict against him.  See Morris v. Woodford, 273 F.3d 826, 834 (9th Cir. 2001)

16  (upholding similar jury instruction against a due process challenge).  In short, petitioner has

17  failed to establish that the giving of CALJIC No. 3.16 to the jury at his trial resulted in

18  "constitutional error."  Coleman, 525 U.S. at 146.

19          Petitioner also argues that the giving of CALJIC No. 3.16 undermined his theory

20  of third party culpability.  The California Court of Appeal concluded that petitioner had waived

21  this argument because of his trial counsel's failure to make a contemporaneous objection to

22  CALJIC No. 3.16 on this basis at the time of his trial.  Respondent argues that the appellate

23  court's ruling constitutes a procedural default which precludes this court from addressing the

24  merits of this claim.  (Answer at 72.)

25          State courts may decline to review a claim based on a procedural default.

26  Wainwright v. Sykes, 433 U.S. 72, 86-87 (1977).  As a general rule, "[a] federal habeas court

79

will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state

law ground that is independent of the federal question and adequate to support the judgment."

Walker v. Martin, ___U.S.___, ___, 131 S. Ct. 1120, 1127 (2011) (quoting Beard v. Kindler, 558

U.S. ___, ___, 130 S. Ct. 612, 615 (2009).  See also Maples v. Thomas, ___U.S.___, ___, 132 S.

Ct. 912, 922 (2012); Greenway v. Schriro, 653 F.3d 790, 797 (9th Cir. 2011); Calderon v. United

States District Court (Bean), 96 F.3d 1126, 1129 (9th Cir. 1996) (quoting Coleman v. Thompson,

501 U.S. 722, 729 (1991)).  "The state-law ground may be a substantive rule dispositive of the

case, or a procedural barrier to adjudication of the claim on the merits."  Walker, 131 S. Ct. at

1127.  In order for a state procedural rule to be found independent, the state law basis for the

decision must not be interwoven with federal law.  Cooper v. Neven, 641 F.3d 322, 332 (9th

Cir.), cert. denied ___U.S.___, 132 S. Ct. 558 (2011); Bennett v. Mueller, 322 F.3d 573, 581 (9th

Cir. 2003); LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001); Park v. California, 202 F.3d

1146, 1152 (9th Cir. 2000).  To be deemed adequate, the rule must be well established and

consistently applied.  Walker, 131 S. Ct. at 1128; Beard 130 S. Ct. at 617; Greenway, 653 F.3d at

797-98; Poland v. Stewart, 169 F.3d 575, 577 (9th Cir. 1999).  Even if the state rule is

independent and adequate, the claims may be reviewed by the federal court if the petitioner can

show:  (1) cause for the default and actual prejudice as a result of the alleged violation of federal

law; or (2) that failure to consider the claims will result in a fundamental miscarriage of justice.

Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Coleman, 501 U.S. at 749-50; see also Maples,

132 S. Ct. at 922.

Respondents have met their burden of adequately pleading an independent and

adequate state procedural ground as an affirmative defense.  See Bennett, 322 F.3d at 586.

Petitioner does not deny that his trial counsel failed to raise a contemporaneous objection to the

jury being instructed with CALJIC No. 3.16.  Petitioner has also failed to meet his burden of

asserting specific factual allegations demonstrating the inadequacy of California's

contemporaneous objection rule as unclear, inconsistently applied or not well-established, either

1   as a general rule or as applied to him. Id.; Melendez v. Pliler, 288 F.3d 1120, 1124-26 (9th Cir.

2   2002). Petitioner's claim is therefore procedurally barred. See Coleman, 501 U.S. at 747; Harris

3   v. Reed, 489 U.S. 255, 264 n.10 (1989); Paulino v. Castro, 371 F.3d 1083, 1092-93 (9th Cir.

4   2004) (claim that defendant's due process rights were violated by the trial court's failure to

5   provide a clarifying instruction sua sponte on the definition of the term "major participant" as

6   used in another instruction was procedurally barred because defense counsel failed to make a

7   contemporaneous objection to the underlying instruction at trial). Petitioner has failed to

8   demonstrate that there was cause for his procedural default or that a miscarriage of justice would

9   result absent review of the claim by this court. See Coleman, 501 U.S. at 748; Paulino, 371 F.3d

10  at 1093; Vansickel v. White, 166 F.3d 953, 957-58 (9th Cir. 1999). This court is therefore

11  precluded on federal habeas review from considering the merits of petitioner's claim that the

12  giving of CALJIC No. 3.16 undermined his defense theory of third party culpability.

13              6. Jury Instruction Pursuant to CALJIC No. 2.21.2

14              In petitioner's next claim for relief, he argues that the giving of CALJIC No.

15  2.21.2 violated his right to due process because "the instruction permitted jurors to resolve

16  dispositive credibility questions as to impeached prosecution witnesses by an improper mere

17  preponderance standard," rather than the "beyond a reasonable doubt standard." (Pet. at 98-99.)

18  The California Court of Appeal rejected this argument on state law grounds, reasoning as

19  follows:

20          **E. CALJIC No. 2.21.2**

21          Arellano complains the trial court instructed pursuant to CALJIC
        No. 2.21.2, "A witness, who is willfully false in one material part

22      of his or her testimony, is to be distrusted in others. You may
        reject the whole testimony of a witness who willfully has testified

23      falsely as to a material point, unless, from all the evidence, you
        believe the *probability* of truth favors his or her testimony in other

24      particulars." (Italics added.) Arellano argues the instruction
        permitted jurors to resolve dispositive credibility questions as to

25      impeached prosecution witnesses by a preponderance standard.
        However, Arellano recognizes we are bound by the California

26      Supreme Court's approval of the instruction (e.g., People v.

1  Nakahara (2003) 30 Cal.4th 705, 714) and states he submits the
2  matter to preserve it for federal review

3  (Opinion at *47.)

4  Petitioner has failed to establish that CALJIC No. 2.21.2, when viewed in the

5  context of the jury instructions as a whole, rendered his trial fundamentally unfair.  The

6  instruction in question applied to all witnesses and left the issue of witness credibility to the jury.

7  Petitioner's jury was also properly instructed with respect to reasonable doubt, the presumption

8  of innocence, the prosecution's burden of proof, and how to assess the credibility of witnesses.

9  Multiple federal district courts have rejected the identical challenge to CALJIC No. 2.21.2

10  mounted by petitioner here.  See Summers v. Malfi, No. CV 07-1027 DOC(JC), 2010 WL

11  3027184, *8-9 (C.D. Cal. June 17, 2010) (rejecting petitioner's claim that CALJIC 2.21.2

12  diminished prosecution's burden of proof); Vasquez v. Pliler, No. 03cv2194 DMS (WMc), 2010

13  WL 2178954, *13 (S.D. Cal. May 26, 2010) (same); Turner v. Adams, No. C 07-6258 MHP

14  (PR), 2010 WL 702268, *22 (N.D. Cal. Feb. 25, 2010) (same); Fleeman v. Castro, No. CIV S-

15  06-0652-FCD-CMK-P, 2009 WL 33241, *8 (E.D. Cal. Jan. 6, 2009) (CALJIC 2.21.2 does not

16  impermissibly alter burden of proof as to any particular charged offense).  Moreover, the Ninth

17  Circuit Court of Appeals, in declining to grant a certificate of appealability with respect to a

18  different challenge to CALJIC 2.21.2, has stated as follows:

19  No reasonable jurist could conclude that, viewed in context, this
20  "instruction by itself so infected the entire trial that the resulting
    conviction violates due process."  Estelle v. McGuire, 502 U.S. 62,
    72, 112 S. Ct. 475, 116 L.Ed.2d 385 (1991) (quoting Cupp v.
21  Naughten, 414 U.S. 141, 147, 94 S. Ct. 396, 38 L.Ed.2d 368
    (1973)).  The petitioner must establish that " 'there is a reasonable
22  likelihood that the jury has applied the challenged instruction in a
    way' that violates the Constitution."  Id. (quoting Boyde v.
23  California, 494 U.S. 370, 380, 110 S. Ct. 1190, 108 L.Ed.2d 316
    (1990)).

24
    When viewed in the context of the instructions as a whole, the
25  willfully false witness instruction did not render Turner's
    conviction constitutionally invalid.  The instruction applied to all
26  witnesses, and did not single out Turner.  The jury was given a

nonexclusive list of factors to consider in determining the truthfulness of the witnesses and was admonished not to disbelieve the testimony of a particular witness simply because it contradicted the testimony of another.  Moreover, there was an evidentiary basis for the instruction because Turner's out-of-court statements to Officer Strength that he did not know Savage and had never been to Merced were contradicted by his own in-court testimony.

Moreover, the text of the willfully false witness instruction itself undermines Turner's argument.  It specifically instructs the jury that "you may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you shall believe the probability of truth favors his testimony in other particulars," thereby informing the jury that it may choose to believe some of the testimony of a witness it finds to be willfully false.  Thus, because the jury "remained free to exercise its collective judgment to reject what it did not find trustworthy or plausible," the instruction could not be applied in a way that challenged the Constitution.  Cupp, 414 U.S. at 149, 94 S. Ct. 396.

Turner v. Calderon, 281 F.3d 851, 865-66 (9th Cir. 2002).  See also Taylor v. Lewis, 460 F.3d 1093, 1097, n.2 (9th Cir. 2006) ("Taylor's first contention is that the state court's decision to affirm his conviction was an objectively unreasonable application of federal law because the use of CALJIC 2.21.2 violated his due process rights.  In a concurrently filed memorandum disposition, we affirm the district court's denial of Taylor's petition as to this issue.")

        In light of the authorities cited above, the decision of the California Court of Appeal rejecting petitioner's challenge to CALJIC No. 2.21.2 is not contrary to or an unreasonable application of clearly established federal law.  Accordingly, petitioner is not entitled to federal habeas relief with respect to his challenge to on this jury instruction.

        K.  Sentence on Counts Three and Four

        In his next claim for relief, petitioner argues that the trial court violated his rights to due process and "fundamental fairness in sentencing" when it improperly calculated "the principal and subordinate terms under counts 3-4."  (Pet. at 100.)

        The California Court of Appeal rejected this argument by petitioner on state law grounds, reasoning as follows:

**A. Section 1170.1**

As to each defendant, on the attempted murder Counts (Counts 3 and 4), the trial court imposed a nine year sentence on Count 4 as the principal count and a reduced, one-third term (two years and four months) on Count 3 as a subordinate term (§ 1170.1), but the court did not reduce to one-third the "25 years to life" firearm enhancements (§ 12022.53) on Count 3.  Nor did the court reduce to one-third the 10-year section 186.22 criminal street gang enhancement imposed on Cervantes on Count 3.

Defendants contend the determinate minimums of the indeterminate section 12022.53 enhancements are subject to reduction under section 1170.1,[23] because section 1170.11 says, "As used in Section 1170.1, the term 'specific enhancement' means an enhancement that relates to the circumstances of the crime.  It includes, but is not limited to, the enhancements provided in Section [ ] . . . 12022.53 . . . ."  We disagree – except as to Cervantes's challenge regarding the section 186.22 enhancement.

"[T]he provisions of the Determinate Sentencing Act (DSA), section 1170 et seq., do not apply to the indeterminate 25-year-to-life gun use enhancement imposed under section 12022.53(d) . . . ."  (People v. Mason (2002) 96 Cal. App.4th 1, 3, 14-15.)  "Indeed, it would be impossible to impose one-third of a sentence of 25 years to life, as there is no number from which to calculate the one-third sentence."  (Id. at p. 15.)

Defendants argue Mason, supra, 96 Cal. App.4th 1, fails to address the fact that, in 1998, the Legislature added in section 1170.11 the specific reference to section 12022.53.  However, section 12022.53 does provide for some determinate enhancements, though they are not at issue in this appeal.  (§ 12022.53, subd. (b) [10 years for personal use of firearm in specified felonies], subd. (c) [20 years for personal and intentional discharge of firearm].)  That section 1170.11 refers to section 12022.53 without specific limitation to subdivisions (b) and (c) does not lend itself to a conclusion that Mason is wrong.

People v. Felix (2000) 22 Cal.4th 651, cited by defendants, does not help their cause.  Felix said that, under the DSA (§ 1170 et seq.), consecutive enhancements are full term for indeterminate crimes, one-third the term for violent determinate crimes, and not imposed at all for nonviolent determinate crimes.  However, the

---

[23]  Section 1170.1, subdivision (a), states in part, "The subordinate term for each consecutive offense shall consist of one-third of the middle term of imprisonment prescribed for each other felony conviction for which a consecutive term of imprisonment is imposed, and shall include one-third of the term imposed for any specific enhancements applicable to those subordinate offenses."

1          enhancements at issue in <u>Felix</u> were determinate, 10-year
           enhancements.  (<u>Id.</u> at p. 654.)

2
           Defendants cite our opinion in <u>People v. Moody</u> (2002) 96 Cal.
3          App.4th 987 at page 993, that section 1170.11, as a more specific,
           later enactment, prevails over earlier, more general provisions.
4          However, what we said in <u>Moody</u> was that the express command
           of the more recent section 1170.11 (that reduced terms for
5          enhancements on subordinate counts includes section 12022.53
           enhancements) prevails over the more general language of section
6          12022.53, subdivision (b), that a 10-year enhancement be imposed
           "[n]otwithstanding any other provision of law."  (<u>Id.</u> at p. 993.)
7          This does not help defendants here.

8   (Opinion at *53-54.)

9          Petitioner's challenge to the sentence imposed for his convictions on counts 3 and

10  4 involves the interpretation of state sentencing law.  Federal habeas corpus relief is unavailable

11  for alleged errors in the interpretation or application of state sentencing laws by either a state trial

12  court or appellate court.  <u>Cacoperdo v. Demosthenes</u>, 37 F.3d 504, 507 (9th Cir. 1994) ("[t]he

13  decision whether to impose sentences concurrently or consecutively is a matter of state criminal

14  procedure and is not within the purview of federal habeas corpus); <u>Hendricks v. Zenon</u>, 993 F.2d

15  664, 674 (9th Cir. 1993).  So long as a sentence imposed by the state courts "is not based on any

16  proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or

17  enhanced by indigency, the penalties for violation of state statutes are matters of state concern."

18  <u>Makal v. State of Arizona</u>, 544 F.2d 1030, 1035 (9th Cir. 1976).  <u>See</u> <u>also</u> <u>Robinson v. Schriro</u>,

19  595 F.3d 1086, 1103 (9th Cir. 2010) ("Federal habeas corpus relief does not lie for mere errors of

20  state law, but only for federal constitutional violations.")  Accordingly, the Ninth Circuit has

21  specifically refused to consider on habeas review claims of erroneous application of state

22  sentencing law by state courts.  <u>See</u>, <u>e.g.</u>, <u>Miller v. Vasquez</u>, 868 F.2d 1116 (9th Cir. 1989)

23  (holding that whether assault with a deadly weapon qualifies as a "serious felony" under

24  California's sentence enhancement provisions is a question of state sentencing law and does not

25  state a federal constitutional claim); <u>see also</u> <u>South v. Schaivo</u>, 289 F.3d 616, 623 (9th Cir. 2002)

26  (petitioner's state law sentencing claims found insufficient to merit federal habeas relief).

On federal habeas review, the question "is not whether the state sentencer committed state-law error," but whether the sentence imposed on the petitioner is "so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation." Richmond v. Lewis, 506 U.S. 40, 50 (1992).  Petitioner has failed to demonstrate that the sentence imposed in this case was arbitrary or capricious or that it constitutes cruel and unusual punishment under the Eighth Amendment.  Accordingly, he is not entitled to federal habeas corpus relief on this sentencing claim.

L.  Imposition of Firearm Sentencing Enhancements

In his next claim for relief, petitioner argues that the trial court violated his right to due process when it imposed the criminal street gang principal firearm sentencing enhancements in imposing sentence on counts 2, 3, and 4.  (Pet. at 101-02.)  The California Court of Appeal rejected this arguments on state law grounds.  The court reasoned as follows:

**B. Section 12022.53**

Arellano contends the trial court erred in imposing firearm enhancements (§ 12022.53) for being a principal in a gang-related crime where a principal used a gun.  Arellano claims the enhancements did not apply to Counts 2 through 4, because he was convicted, not as a principal, but as an aider/abettor under the natural/probable consequences doctrine.  We disagree.

Section 12022.53, subdivision (e)(1), provides, "The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved:  [¶]  (A) The person violated subdivision (b) of Section 186.22. [¶]  (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d) [use of firearm]."

Section 31 defines "principals" as "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission . . . ."

Arellano argues section 31 means only aiders/abettors of the target offense, not aiders/abettors held liable for natural and probable consequences.  Arellano argues the natural/probable consequences doctrine was developed by the courts after enactment of section 31, and any ambiguity should be resolved in his favor.

/////

1
2
3
4

> However, People v. Gonzalez (2001) 87 Cal. App.4th 1, rejected a due process challenge to section 12022.53, subdivision (e), and concluded, "the only requirement is that the aider and abettor intend to facilitate the target offense and that the offense ultimately committed is the natural and probable consequence of the target offense." (Id. at p. 15.)

5

> The contention fails.

6  (Opinion at *54-55.)

7          As was the case in the claim addressed immediately above, petitioner's challenge

8  to the sentencing enhancements imposed as part of the sentence he received on counts 2, 3 and 4

9  involves only the interpretation of state sentencing law, which is not cognizable in this federal

10  habeas corpus action.  Nor has petitioner demonstrated that the sentence he received on counts 2,

11  3 and 4 violated the Eighth Amendment or was arbitrary and capricious, in violation of the Due

12  Process Clause.  Accordingly, petitioner is not entitled to federal habeas relief on this claim..

13          M.  Cunningham Error

14          Citing the decision in Cunningham v. California, 549 U.S. 270 (2007) "and its

15  predecessors," petitioner claims that the trial court violated his Sixth Amendment right to a jury

16  trial when it sentenced him to the upper term on Count 4 based on factors not submitted to the

17  jury.  (Pet. at 102.)  Petitioner argues that only one of the five aggravating factors relied on by the

18  sentencing judge to sentence him to the upper term was based on "prior convictions, admissions,

19  or jury findings."  (Id.)  He contends that, absent evidence that any one factor was determinative,

20  it cannot be concluded that the court would have imposed the upper term based solely on his

21  prior conviction.  (Id.)  The California Court of Appeal also rejected these arguments, reasoning

22  as follows:

23          **C. Upper Term (Arellano . . .)**

24  > Arellano and Cervantes contend the trial court's imposition of upper terms based on factors not submitted to the jury violates

25  > Cunningham v. California (2007) 549 U.S. 270 [166 L.Ed.2d 856]. We disagree.

26  /////

1                With respect to Arellano, the court said, "Reason for the upper
               term was set forth in the probation report, but specifically that the
2                defendant induced the others to participate.  The seriousness of the
               offense, the victim's [sic] vulnerability in age, the defendant's
3                substantial prior record, the defendant's violent conduct and the
               defendant's performance on probation and parole.   [¶]   Court
4                found no mitigating circumstances."  The prior criminal record did
               not need to be submitted to the jury, and this one factor suffices for
5                imposition of the upper term.  (People v. Towne (2008) 44 Cal.4th
               63; People v. Sandoval (2007) 41 Cal.4th 825; People v. Black
6                (2007) 41 Cal.4th 799 (Black).)

7 (Opinion at *55.)

8         The United States Supreme Court has held that the Due Process Clause of the

9 Fourteenth Amendment requires any fact other than a prior conviction that "increases the penalty

10 for a crime beyond the prescribed statutory maximum" to be "submitted to a jury and proved

11 beyond a reasonable doubt."  Apprendi v. New Jersey, 530 U.S. 466, 490 (2000).  The Supreme

12 Court subsequently held that California's Determinate Sentencing Law violated a defendant's

13 right to a jury trial to the extent it permitted a trial court to impose an upper term based on facts

14 found by the court rather than by a jury.  Cunningham, 549 U.S. at 291.[24]  In Blakely v.

15 Washington, 542 U.S. 296, 303-04 (2004), the Supreme Court decided that a defendant in a

16 criminal case is entitled to have a jury determine beyond a reasonable doubt any fact that

17 increases the statutory maximum sentence, unless the fact was admitted by the defendant or was

18 based on a prior conviction.

19         Under California law, only one valid aggravating factor need be found in order to

20 authorize an upper term sentence.  Butler v. Curry, 528 F.3d 624, 641 (2008); Kessee v.

21

22      [24]   The Supreme Court also determined in Cunningham that "the middle term prescribed
23 in California's statutes, not the upper term, is the relevant statutory maximum."  Id. at 288.  The
California Legislature responded to this determination by amending California Penal Code §
24 1170(b) to vest sentencing courts with the discretion to impose the lower, middle or upper terms
without making specific factual findings, thereby making the upper term the maximum term
25 under California law.  See People v. Sandoval, 41 Cal. 4th 825, 844-52 (2007).  The Ninth
Circuit has subsequently held that Cunningham "did not announce a new rule of constitutional
26 law and may be applied retroactively on collateral review."  Butler v. Curry, 528 F.3d 624, 639
(9th Cir. (2008)).

1   Mendoza-Powers, 574 F.3d 675, 676 n.1 (9th Cir. 2009); see also Moore v. Evans, No. 2:09-cv-

2   2737-JFM (HC), 2010 WL 4290080, at *9 (E.D. Cal. Oct. 22, 2010); Armstrong v. Small, No.

3   CV 07-1101 RGK (FMO), 2009 WL 863351, at *17 (C.D. Cal. Mar. 30, 2009); People v. Black,

4   41 Cal.4th 799 (2007); People v. Osband, 13 Cal. 4th 622, 728 (1996).  That is, only one

5   aggravating factor is necessary to set the upper term as the "statutory maximum" for Apprendi

6   and Blakely purposes as long as it is established in accordance with the constitutional

7   requirements set forth in Blakely.  Black, 41 Cal.4th at 812.  While the sentencing court may

8   make factual findings with respect to additional aggravating circumstances, these findings,

9   themselves, do not further raise the authorized sentence beyond the upper term.  Id.  Moreover,

10  with respect to claims of Apprendi error, "the relevant question is not what the trial court would

11  have done, but what it legally could have done."  Butler, 528 F.3d at 648.  Therefore, whether a

12  sentencing judge might not have imposed an upper term sentence in the absence of additional

13  aggravating factors does not implicate the Sixth Amendment.  Butler, 528 F.3d at 649.  Rather, a

14  petitioner's upper term sentence is not unconstitutional if at least one of the aggravating factors

15  that the sentencing judge relied upon was established in a manner consistent with the Sixth

16  Amendment.

17          In Almendarez-Torres v. United States, 523 U.S. 224, 239-47 (1998), the

18  Supreme Court held that the fact of a prior conviction does not have to be determined by a jury

19  before a sentencing court may rely upon the conviction as the basis for a sentencing

20  enhancement.  Rather, the court concluded, prior convictions may be found by the judge based on

21  a preponderance of evidence.  Id. at 239-47; see also United States v. Medina-Villa, 567 F.3d

22  507, 520 (9th Cir. 2009) ("Almendarez-Torres remains good law").  The task of determining the

23  precise contours of the Almendarez-Torres prior convictions exception "has been left to the

24  federal appellate courts."  Kessee v. Mendoza-Powers, 574 F.3d 675, 677 (9th Cir. 2009)

25  (holding that the state court's use of a finding that the petitioner was on probation at the time of

26  the offense to increase his sentence was not contrary to clearly established federal law).  Here, the

89

California Court of Appeal concluded that, in imposing the upper term, the trial court was entitled to rely on the fact of petitioner's record of prior convictions.  The state appellate court's decision is consistent with the holding in <u>Almendariz-Torres</u> and therefore may not be set aside on federal habeas review.  Because the trial judge could have legally imposed the upper terms solely based on petitioner's prior convictions, his upper term sentence is not unconstitutional.

In any event, <u>Apprendi</u> errors are subject to harmless error analysis.  <u>Washington v. Recueno</u>, 548 U.S. 212 (2006); <u>Estrella v. Ollison</u>, 668 F.3d 593, 599 (9th Cir. 2011); <u>Butler</u>, 528 F.3d at 648-49.  Petitioner is entitled to federal habeas relief only upon a showing that any violation of his constitutional rights had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 623.  "Under that standard, [a reviewing court] must grant relief if we are in 'grave doubt' as to whether a jury would have found the relevant aggravating factors beyond a reasonable doubt." <u>Butler</u>, 528 F.3d at 648 (citing <u>O'Neal v. McAninch</u>, 513 U.S. 432, 436 (1995)).  <u>See also</u> <u>Estrella</u>, 668 F.3d at 600.  "Grave doubt exists when, 'in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.'" <u>Butler</u>, 528 F.3d at 648 (citing <u>O'Neal</u>, 513 U.S. at 435).

Here, as noted by the state appellate court, the sentencing judge imposed the upper term sentence on one count based, in part, on the fact that petitioner "induced the others to participate," the seriousness of the offense, the victims' "vulnerability in age," petitioner's violent conduct, and petitioner's performance on probation and parole, as well as his prior record. (Opinion at *55.)  There is no doubt that a jury would have found petitioner eligible for the upper term based on these factors.  <u>See</u> <u>Estrella</u>, 668 F.3d at 600 ("[W]e do not have a grave doubt that the jury would have found beyond a reasonable doubt that Estrella committed the kidnapping while on parole for assault."); <u>Butler</u>, 528 F.3d at 648 ("Any <u>Apprendi</u> error therefore will be harmless if it is not prejudicial as to just one of the aggravating factors at issue.").  Accordingly, any error by the trial judge in imposing the upper term based on the cited factors was harmless.

1    For these reasons, petitioner is not entitled to federal habeas relief on his Sixth

2  Amendment/<u>Cunningham</u> error claim.

3    N.  <u>Cumulative Errors</u>

4    In his next claim for relief, petitioner argues that the cumulative effect of the

5  various constitutional errors in his case deprived him of his right to due process.  (Pet. at 100.)

6  The California Court of Appeal rejected this contention, stating:

7    **XI. Claims of Cumulative Error**

8    Defendants claim the cumulative effect of error warrants reversal.
     Having reviewed all assignments of error, we reject the contention.
9

10  (Opinion at *56.)

11    The Ninth Circuit has concluded that under clearly established United States

12  Supreme Court precedent, the combined effect of multiple trial errors may give rise to a due

13  process violation if it renders a trial fundamentally unfair, even where each error considered

14  individually would not require reversal.  <u>Parle v. Runnels</u>, 505 F.3d 922, 927 (9th. Cir. 2007)

15  (citing <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974) and <u>Chambers v. Mississippi</u>, 410

16  U.S. 284, 290 (1973)).  <u>See also</u> <u>Hayes v. Ayers</u>, 632 F.3d 500, 524 (9th Cir. 2011) (if no error of

17  constitutional magnitude occurred at trial, "no cumulative prejudice is possible").  "The

18  fundamental question in determining whether the combined effect of trial errors violated a

19  defendant's due process rights is whether the errors rendered the criminal defense 'far less

20  persuasive,' <u>Chambers</u>, 410 U.S. at 294, and thereby had a 'substantial and injurious effect or

21  influence' on the jury's verdict."  <u>Parle</u>, 505 F.3d at 927 (quoting <u>Brecht</u>, 507 U.S. at 637).

22    This court has addressed each of petitioner's claims raised in the instant petition

23  and has concluded that no error of constitutional magnitude occurred at his trial in state court.

24  This court also concludes that the alleged errors, even when considered together, did not render

25  petitioner's defense "far less persuasive," nor did they have a "substantial and injurious effect or

26  /////

1    influence on the jury's verdict" in his case.  Accordingly, petitioner is not entitled to federal

2    habeas relief on his claim of cumulative error.

3        O.  Joinder in Co-Defendants' Claims

4            Petitioner also informs the court that he "joins and incorporates by reference

5    herein on collateral review, all arguments raised, or to be raised, by his copetitioners in this case

6    and any related writs, motions, or appeals."  (Pet. at 103.)  Petitioner notes that, at trial, all of the

7    defendants were deemed to have joined in each other's "motions and trial objections," and "in

8    limine rulings were deemed binding, and objections were deemed to include constitutional

9    grounds."  (Id.)  He therefore joins "all arguments to be raised by copetitioners in this Court as

10   well."  (Id.)

11           Respondent argues that petitioner may not join in claims or other petitions filed by

12   his co-defendants because he has not signed and verified those pleadings.  (Answer at 79.)  See

13   28 U.S.C. § 2242 ("Application for a writ of habeas corpus shall be in writing signed and verified

14   by the person for whose relief it is intended or by someone acting in his behalf.").  Respondent

15   also argues that, pursuant to Eastern District of California Local Rule 220, a petition for a writ of

16   habeas corpus must be complete in itself without reference to prior or superseded pleadings.  (Id.)

17   Respondent notes that petitioner's co-defendant James Olague has filed a petition for writ of

18   habeas corpus in this court.  See Olague v. Hedgpeth, No. 2:10-cv-1659 GEB CHS (E.D. Cal.)

19   Out of an abundance of caution, respondent has attached a copy of the answer filed in the Olague

20   habeas action, and "submit[s] that as our response to Petitioner's joinder claim if this Court holds

21   that Petitioner has properly raised the claims in this petition."  (Answer at 79.)

22           In his traverse, petitioner requests that, if he is precluded on procedural grounds

23   from joining in co-defendant Olague's federal petition for writ of habeas corpus, this court take

24   "judicial notice" of the record in Olague's federal habeas action.  (Doc. No. 26 (hereinafter

25   Traverse) at 7.)

26   /////

92

The habeas petition in <u>Olague v. Hedgpeth</u>, No. 2:10-cv-1659 GEB CHS (E.D. Cal.) was denied on December 16, 2011, in an order adopting the assigned Magistrate Judge's August 12, 2011 findings and recommendations.  Petitioner Olague did not file an appeal from the judgment entered in that habeas action.  Accordingly, even assuming arguendo that petitioner is entitled to assert claims here that were advanced by Olague in his habeas petition filed in this court, petitioner has failed to demonstrate that those claims have merit.  To the extent petitioner is requesting to join other claims or arguments made by unknown persons in petitions that have yet to be filed in this court or in other courts, such claims are too speculative to warrant consideration in this federal habeas proceedings.

III.  <u>Request for Evidentiary Hearing</u>

Petitioner requests an evidentiary hearing on all of his claims contained in the instant petition.  (Traverse at 7.)

Pursuant to 28 U.S.C. § 2254(e)(2), an evidentiary hearing is appropriate under the following circumstances:

> (e)(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that-
>
>    (A) the claim relies on-
>
>       (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
>       (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
>    (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense[.]

Under this statutory scheme, a district court presented with a request for an evidentiary hearing must first determine whether a factual basis exists in the record to support a petitioner's claims and, if not, whether an evidentiary hearing "might be appropriate."  <u>Baja v.</u>

1   Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999).  See also Earp v. Ornoski, 431 F.3d 1158, 1166

2   (9th Cir. 2005); Insyxiengmay v. Morgan, 403 F.3d 657, 669-70 (9th Cir. 2005).  A petitioner

3   requesting an evidentiary hearing must also demonstrate that he has presented a "colorable claim

4   for relief."  Earp, 431 F.3d at 1167 (citing Insyxiengmay, 403 F.3d at 670, Stankewitz v.

5   Woodford, 365 F.3d 706, 708 (9th Cir. 2004) and Phillips v. Woodford, 267 F.3d 966, 973 (9th

6   Cir. 2001)).  To show that a claim is "colorable," a petitioner is "required to allege specific facts

7   which, if true, would entitle him to relief."  Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998)

8   (internal quotation marks and citation omitted).[25]

9              The court concludes that no additional factual supplementation is necessary in this

10  case and that an evidentiary hearing is not appropriate with respect to the claims raised in the

11  instant petition.  For the reasons described above, the facts alleged in support of these claims,

12  even if established at a hearing, would not entitle petitioner to federal habeas relief.  Further,

13  petitioner has not identified any concrete and material factual conflict that would require this

14  court to hold an evidentiary hearing in order to resolve.  Therefore, petitioner's request for an

15  evidentiary hearing will be denied.

16                                          CONCLUSION

17             Accordingly, for all of the reasons set forth above, IT IS HEREBY ORDERED

18  that:

19         1.  Petitioner's application for a writ of habeas corpus is denied;

20         2.  Petitioner's request for an evidentiary hearing is denied;

21  /////

22  /////

23  /////

24

25         [25] The Supreme Court has now held that federal habeas review under 28 U.S.C. §
    2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on
26  the merits" and "that evidence introduced in federal court has no bearing on" such review.
    Cullen v. Pinholster, 563 U.S. ___, ___, 131 S. Ct. 1388, 1398, 1400 (2011).

1        3.  The court declines to issue a certificate of appealability; and

2        4.  The Clerk of Court is directed to close this case.

3   DATED: September 17, 2012.

4

5                                                        _____

6                                                        DALE A. DROZD
                                                         UNITED STATES MAGISTRATE JUDGE
7   DAD:8:
    arellano2684.hc
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26